ERICA A. MAHARG (Bar No. 279396)
Email: eam@atalawgroup.com
HARRISON M. BECK (Bar No. 341717)
Email: hmb@atalawgroup.com
AQUA TERRA AERIS LAW GROUP
8 Rio Vista Ave.
Oakland, CA 94611
Telephone: (415) 568-5200

ANDREW L. PACKARD (Bar No. 168690)
Email: andrew@packardlawoffices.com
LAW OFFICES OF ANDREW L. PACKARD
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Telephone: (707) 782-4060

**Attorneys for Plaintiff**
*California Sportfishing*
*Protection Alliance*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>                Plaintiff,<br><br>  vs.<br><br>WEST CONTRA COSTA SANITARY LANDFILL, INC.; WEST COUNTY LANDFILL, INC.; REPUBLIC SERVICES, INC.; KEN LEWIS; BRENT BEVERIDGE; and BEN WADE,<br><br>                Defendants. | Case No.: _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq*.; Resource Conservation and Recovery Act, 42 U.S.C. § 6972 *et seq*.)** |

California Sportfishing Protection Alliance ("CSPA" or "Plaintiff"), by and through their counsel, hereby allege:

## I.    <u>JURISDICTION</u>

1.    This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1387 ("Clean Water Act" or "CWA") and the analogous provision of the Resource Conservation and Recovery Act ("RCRA"). *See* 33 U.S.C. § 1365; 42 U.S.C. § 6972(a)(1)(B). This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) (CWA citizen suit to enforce effluent standard or limitation), 42 U.S.C. § 6972(a)(1)(B) (RCRA citizen suit against any entity "who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment"), and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States). The relief requested is specifically authorized pursuant to 33 U.S.C. §§ 1365(a) (CWA injunctive relief) and 1319(d) (CWA civil penalties), 42 U.S.C. §§ 6972(a)(1)(B) (RCRA injunctive relief) and 6928(g) (RCRA civil penalties), and 28 U.S.C. §§ 2201-2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2.    Pursuant to 40 C.F.R. § 135.2(a)(2) and 42 U.S.C. § 6972(c), on or about May 2, 2025, CSPA issued a 60-day notice letter ("Notice Letter") to West Contra Costa Sanitary Landfill, Inc., West County Landfill, Inc., Republic Services, Inc., Ken Lewis, Brent Beveridge and Ben Wade (hereinafter "Republic" or "Defendants") as the owners and operators of a landfill facility located at 1 Parr Boulevard, in Richmond, California (the "Facility").

3.    The Notice Letter was also sent to the U.S. Attorney General, the Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Regional Administrator of EPA Region IX, the Executive Director of the State

Water Resources Control Board ("State Board"), the Director of the California Department of Resources, Recycling, and Recovery, and the Executive Officer of the San Francisco Bay Regional Water Quality Control Board ("Regional Board"), as required by 33 U.S.C. § 1365(b)(1)(A) and 42 U.S.C. § 6972(c). The Notice Letter is attached hereto as **Exhibit A** and is fully incorporated herein by reference.

4. The Notice Letter informed Republic of its ongoing violations of the substantive and procedural requirements of the Clean Water Act, 33 U.S.C. § 1251 *et seq*., California's General Industrial Storm Water Permit, National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001 Water Quality Order No. 2014-0057-DWQ as amended by Order No. 2015-0122-DWQ, and as subsequently amended by Order No. 2018-0028-DWQ (effective July 1, 2020) (hereafter the "Storm Water Permit"), and RCRA, 42 U.S.C. § 6972 *et seq*., at the Facility.

5. The Notice Letter also informed Defendants that the conditions constituting violations of the Clean Water Act and RCRA at the Facility also constitute a public nuisance.

6. The Notice Letter informed Defendants of Plaintiff's intent to file suit against Defendants to enforce the Clean Water Act, RCRA, and State nuisance law.

7. More than sixty (60) days have passed since the Notice Letter was served on Defendants and the State and Federal agencies. Plaintiff is informed and believes, and in turn alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B); 42 U.S.C. § 6972.

8. This action is not barred by any prior administrative penalty under the Clean Water Act, 33 U.S.C. § 1319(g), or RCRA, 42 U.S.C. § 6972.

9. Venue is proper in the Northern District of California pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1) and RCRA, 42 U.S.C. §6972(a)(1), because the sources of the violations are located within this District, and pursuant to 28 U.S.C. § 1391(b), because Defendants reside in this District and a

substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Intra-district venue is proper in San Francisco or Oakland, California, because the sources of the violations are located within Contra Costa County. Civil Local Rule 3-2(d).

10.    This Court has supplemental jurisdiction over the Plaintiff's public nuisance claim pursuant to 26 U.S.C. § 1367(a).

## II.    <u>INTRODUCTION</u>

11.    This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Republic's substantive and procedural violations of the Storm Water Permit, the Clean Water Act, and RCRA resulting from its operations at the Facility.

12.    Under the Clean Water Act, CSPA specifically alleges violations regarding Defendants' discharge of pollutants from the Facility into Wildcat Marsh, San Pablo Creek, San Pablo Bay, the San Francisco Bay, and the Pacific Ocean (collectively the "Impacted Waters"); violations of the monitoring, reporting, and best management practices requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, and that these violations are ongoing and continuous.

13.    Under RCRA, CSPA specifically alleges violations regarding Defendants' actions (and failures to act) in creating and maintaining an imminent and substantial endangerment to public health and to the environment by failing repeatedly and significantly to prevent the outward release of toxin-laden leachate into the Impacted Waters, and that these violations are ongoing and continuous.

## III.    <u>PARTIES</u>

1

## A.   California Sportfishing Protection Alliance

14.    CSPA is a California non-profit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of California waters, including the waters into which Republic unlawfully discharges polluted stormwater and/or leachate. For forty years, CSPA has been recognized in California and in the nation as a leading enforcer of state and federal environmental laws protecting water resources. To further its goals, CSPA actively seeks federal and state agency implementation of state and federal water quality laws, including the CWA, and as necessary, directly initiates enforcement actions on behalf of itself and its members.

15.    Members of CSPA (including citizens, taxpayers, property owners, and residents) live, work, travel, and recreate on and near the Impacted Waters, into which Republic causes pollutants to be discharged. These members of CSPA use and enjoy the Impacted Waters for recreational, educational, scientific, conservation, aesthetic, and spiritual purposes. Members of CSPA also use and enjoy these waters for fishing, for their estuarine habitat and the rare, threatened, and endangered species it supports, and for their wildlife habitat, marine habitat, and other designated beneficial uses. Discharges of pollutants from the Facility impair each of these uses. These discharges of polluted stormwater and leachate from the Facility are ongoing and continuous. Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Republic' failure to comply with the CWA and RCRA, and by Republic's creation and maintenance of a public nuisance.

16.    Discharges of polluted stormwater and non-stormwater from the Facility degrade water quality and harm aquatic life in the Impacted Waters and impair CSPA's members' use and enjoyment of those waters. The unlawful discharge of pollutants from the Facility requires CSPA to expend its limited resources to study and combat pollution from the Facility.

17.     These violations of the Storm Water Permit, Clean Water Act, and RCRA at the Facility are ongoing and continuous, including but not limited to Defendants' discharge of polluted stormwater and leachate from the Facility. Thus, Plaintiff's members' interests have been, are being, and will continue to be adversely affected by Republic's failure to comply with the Storm Water Permit, the Clean Water Act, and RCRA.

18.     Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and its members, for which they have no plain, speedy or adequate remedy at law.

19.     The relief sought herein will redress the harm to Plaintiff caused by Republic's activities.

**B.     Republic and the Facility**

20.     Plaintiff is informed and believes, and thereon alleges, that the Facility is owned by West County Landfill, Inc. and operated by West Contra Costa Sanitary Landfill, Inc.

21.     Plaintiff is further informed and believes and thereon alleges that both West County Landfill, Inc. and West Contra Costa Sanitary Landfill, Inc. are active corporations registered in California, wholly owned by Republic Services, Inc.

22.     Republic Services, Inc. is the second largest provider of waste disposal services in the United States, owning or operating 206 active landfills and having responsibility for closure and post-closure obligations at another 128 closed landfills, including the Facility at issue here.

23.     According to the information currently available to CSPA, Ken Lewis is the Storm Water Manager of the Facility and Legally Responsible Person for compliance with the Storm Water Permit; Brent Beveridge is the Environmental Compliance Manager of the Facility; and Ben Wade is the Area Environmental Manager for Republic Services, Inc. Plaintiff is informed and believes and thereon

alleges that these individuals collectively and individually make operational decisions for the Facility that have resulted in the alleged violations.

## III.    LEGAL BACKGROUND

### A.    The Clean Water Act

24.    Congress enacted the Clean Water Act in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The CWA prohibits the discharge of pollutants into United States waters except as authorized by the statute. 33 U.S.C. § 1311; *San Francisco Baykeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1156 (9th Cir. 2002). The CWA is administered largely through the NPDES permit program. 33 U.S.C. § 1342.

25.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from a point source into a navigable water unless the discharge complies with various enumerated sections of the Clean Water Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a NPDES permit issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1342(b); *see also* 40 C.F.R. § 122.26(c)(1); *Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1145 (9th Cir. 2000).

26.    The phrase "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see also* 40 C.F.R. § 122.2.

27.    The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see also* 40 C.F.R. § 122.2.

28.    The phrase "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or

vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see also* 40 C.F.R. § 122.2.

29.    "Navigable waters" means "the waters of the United States." 33 U.S.C. 1362(7); 33 C.F.R. § 328.3.

30.    In 1987, the CWA was amended to establish a framework for regulating stormwater discharges through the NPDES system. Water Quality Act of 1987, Pub. L. 100-4, § 405, 101 Stat. 7, 69 (1987) (codified at 33 U.S.C. § 1342(p)); *see also Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 840-41 (9th Cir. 2003) (describing the problem of stormwater runoff and summarizing the Clean Water Act's permitting scheme). Section 402(p) of the Clean Water Act establishes a framework for regulating municipal and industrial stormwater discharges under the NPDES program. *Id.* § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial stormwater discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial stormwater dischargers. *Id.* § 1342.

31.    Section 301(b) of the Clean Water Act requires that all point source dischargers, including those discharging polluted stormwater, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *Id.* § 1311(b).

32.    Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. §§ 1365(a)(1) and 1365(f).

33.    Defendants are "persons" within the meaning of Section 502(5) of the Clean Water Act. *Id.* § 1362(5).

34.   An action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. *Id.* § 1365(a).

35.   Pursuant to Section 309(d) of the Act, *id.* § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act occurring after November 2, 2015, where penalties are assessed on or after December 27, 2023, commencing five (5) years prior to the date of the Notice Letter subjects each Defendant to a penalty of up to $66,712 per day per violation.

36.   Section 505(d) of the Clean Water Act permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees. 33 U.S.C. § 1365(d).

**B.   California's Stormwater Permit**

37.   Section 402(b) of the Clean Water Act allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted stormwater. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial stormwater discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial stormwater dischargers. *Id.* § 1342(b).

38.   Pursuant to Section 402 of the Clean Water Act, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has designated the State Board and the Regional Boards to administer its NPDES program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.* (2006) 135 Cal.App.4th 1377, 1380-81. In California, the State Board is charged with regulating pollutants to protect California's water resources. Cal. Water Code § 13001.

39.   The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the Clean Water Act, 33 U.S.C. §§ 1342(b),

(p), and 40 C.F.R. § 123.25.

40.    Violations of the Storm Water Permit are also violations of the Clean Water Act. Storm Water Permit, Section XXI(A).

41.    The State Board issued the Storm Water Permit, a statewide general permit for industrial discharges, on or about November 19, 1991; modified the Storm Water Permit on or about September 17, 1992; and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

42.    On July 1, 2015, the current Storm Water Permit became effective and was issued as NPDES General Permit No. CAS000001 State Water Resources Control Board Water Quality Order No. 2014-0057-DWQ. Storm Water Permit, Section I(A).

43.    On November 6, 2018, the State Board amended the Storm Water Permit with Order No. 2015-0122-DWQ ("2018 Permit Amendment").

44.    On July 1, 2020, the State Board subsequently amended the Storm Water Permit with Order No. 2018-0028-DWQ ("2020 Permit Amendment").

45.    To discharge stormwater lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms or obtain and comply with an individual NPDES permit. Storm Water Permit, Section I.A. Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the Storm Water Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. Storm Water Permit, Section I.A (Finding 17), Section II.B.

46.    The Storm Water Permit contains three primary and interrelated categories of requirements: 1) discharge prohibitions, receiving water limitations, and effluent limitations; 2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and 3) monitoring and reporting requirements, including the requirement to prepare an annual report.

47.    The Storm Water Permit contains certain absolute prohibitions. For example, the Storm Water Permit prohibits the direct or indirect discharge of materials other than stormwater ("non-stormwater discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. Storm Water Permit, Discharge Prohibition III(B).

48.    The Storm Water Permit also incorporates Effluent Limitation Guidelines ("ELGs") for industrial stormwater discharges from facilities in specific industrial categories. Storm Water Permit, Section I.K.

49.

### EFFLUENT LIMITATIONS

| Regulated parameter | Maximum daily [1] | Maximum monthly avg. [1] |
|---|---|---|
| BOD | 140 | 37 |
| TSS | 88 | 27 |
| Ammonia (as N) | 10 | 4.9 |
| α-Terpineol | 0.033 | 0.016 |
| Benzoic acid | 0.12 | 0.071 |
| p-Cresol | 0.025 | 0.014 |
| Phenol | 0.026 | 0.015 |
| Zinc | 0.20 | 0.11 |
| pH | [2] | [2] |

[1] Milligrams per liter (mg/L, ppm)
[2] Within the range 6 to 9.

Here, the Facility is a landfill and therefore subject to the stormwater ELGs identified in Attachment F of the Storm Water Permit. Storm Water Permit, Section V.B. Landfills that discharge "contaminated stormwater" must achieve the effluent limitations in the table above, which represent the application of best practicable control technology currently available and the best conventional pollutant control technology. 40 C.F.R. §§ 445.21-23. "Contaminated stormwater" is defined as "storm water which comes in direct contact with landfill wastes, the waste handling and treatment areas, or landfill wastewater as defined in paragraph (f) of this section." *Id.* § 445.2(b). "Contaminated storm water" is included in the definition of "landfill wastewater." 40 C.F.R. § 445.2(f).

50.    Self-monitoring reports under the Storm Water Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

51.    Dischargers must collect and analyze stormwater samples from two (2) storm events within the first half of each reporting year (July to December) and two (2) storm events during the second half of each reporting year (January to June). Storm Water Permit, Section XI.B. Section XI.B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters set forth in Table 2 of the Storm Water Permit, and other pollutants likely to be in the stormwater discharged from the facility based on the pollutant source assessment. Storm Water Permit, Section XI.B.6. Dischargers must submit all sampling and analytical results via SMARTS within thirty (30) days of obtaining all results for each sampling event. Storm Water Permit, Section XI.B.11.

52.    Dischargers must further implement Best Management Practices ("BMPs") that satisfy the BAT/BCT requirements of the CWA and the Storm Water Permit to reduce or prevent discharges of pollutants in their stormwater discharges. Storm Water Permit, Effluent Limitation V.A. To meet the BAT/BCT standard, dischargers must implement minimum BMPs and any advanced BMPs set forth in the Storm Water Permit's SWPPP Requirements provisions where necessary to reduce or prevent pollutants in discharges. *See* Storm Water Permit, Sections X.H.1-2.

53.    The Storm Water Permit contains Numeric Action Levels ("NALs"). Storm Water Permit, Section I(M). Annual NALs, not accounting for water hardness, for the following parameters are: aluminum—0.75 mg/L; iron—1.0 mg/L; nitrate plus nitrite nitrogen ("N+N")—0.68 mg/L; chemical oxygen demand ("COD") —120 mg/L; phosphorous—2 mg/L; and copper—0.0332 mg/L. Storm Water Permit, Section XI.

54.    An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter.

55.    Exceedances of NALs are evidence of a facility's failure to implement adequate BMPs. *Santa Monica Baykeeper v. Kramer Metals,* 619 F.Supp.2d 914, 920, 923 (C.D. Cal. 2009).

56.    Moreover, pursuant to the Storm Water Permit, Dischargers must develop and implement a SWPPP at the time industrial activities begin. Storm Water Permit, Sections I(I) (Finding 54) and X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility. Storm Water Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in stormwater and authorized, non-stormwater discharges. Storm Water Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. Storm Water Permit, Sections I(D) (Finding 32) and X(C).

57.    The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the stormwater conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of stormwater management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges; the identification and elimination of non-stormwater discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and

a description of individuals and its current responsibilities for developing and implementing the SWPPP. Storm Water Permit, Section X.

58.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. Storm Water Permit, Section X(A)-(B). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. Storm Water Permit, Section X(B) and Section XV.

59.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. Storm Water Permit, Sections I(J) (Finding 55) and X(B)(1). Significant SWPPP revisions must be certified and submitted by the discharger via the State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS") within 30 days. Storm Water Permit, Section X(B)(2). Dischargers are required to submit revisions to the SWPPP that are determined not to be significant every three (3) months in the reporting year. *Id.* at Section X(B)(3); Storm Water Permit, Fact Sheet, Section II(I)(1).

60.     In addition, the Storm Water Permit requires facility operators to develop and implement a Monitoring Implementation Plan. Storm Water Permit Section XI(A)– (D). The Monitoring Implementation Plan must ensure that stormwater discharges comply with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Storm Water Permit. Storm Water Permit Section XI. The Monitoring Implementation Plan must ensure that practices at the facility to prevent or reduce pollutants in stormwater and authorized non-stormwater discharges are

evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

61.    The Monitoring Implementation Plan is meant to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that stormwater and non-stormwater discharges comply with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. Storm Water Permit, Section XI.

62.    The Storm Water Permit requires facility operators to monitor and sample stormwater discharges to ensure that the facility is complying with the terms of the permit. Storm Water Permit, Sections I(J) (Findings 55–56) and XI.

63.    Section XI(A)(4) of the Storm Water Permit requires that the Monitoring Implementation Plan be revised as necessary to ensure compliance with the Storm Water Permit.

64.    Section XI(B)(1) of the Storm Water Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

65.    Section XI(B)(2) of the Storm Water Permit requires dischargers to collect and analyze stormwater samples from two (2) Qualifying Storm Events within the first half of each reporting year (July 1 to December 31), and two (2) Qualifying Storm Events within the second half of each reporting year (January 1 to June 30).

66.    Facilities must sample and analyze additional parameters identified on a facility-specific basis to reflect a facilities' pollutant source assessment.

67.    Section XVI of the Storm Water Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of the permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers

1  and/or Sections, of all revisions made to the SWPPP within the reporting year, and the

2  date(s) of the Annual Evaluation.

3       68.    When the 2015 Permit became effective on July 1, 2015, all permittees

4  were in "Baseline status." 2015 Permit, Section XII(B). A permittee's Baseline status

5  for any given parameter changes to "Level 1 status" if sampling results indicate a NAL

6  exceedance for that same parameter. Storm Water Permit, Section XII(C).

7       69.    Level 1 status commences on July 1 following the reporting year during

8  which the exceedance(s) occurred. Storm Water Permit, Section XII(C). By October 1

9  following commencement of Level 1 status, permittees are required to: complete an

10  evaluation, with the assistance of a Qualified Industrial Storm Water Practitioner, of

11  the industrial pollutant sources at the facility that are or may be related to the NAL

12  exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP

13  and any additional BMPs and SWPPP revisions necessary to prevent future NAL

14  exceedances and to comply with the requirements of Storm Water Permit. Storm Water

15  Permit Section XII(C)(1)(a)-(c).

16       70.    Although the evaluation may focus on the drainage areas where the NAL

17  exceedance(s) occurred, all drainage areas must be evaluated. Storm Water Permit,

18  Section XII(C)(1)(c).

19       71.    As soon as practicable but no later than January 1 following

20  commencement of Level 1 status, the permitee must revise its SWPPP as necessary and

21  implement any additional BMPs identified in the evaluation and then also certify and

22  submit via SMARTS a Level 1 Exceedance Response Action ("ERA") Report that

23  includes a summary of the Level 1 ERA Evaluation and a detailed description of the

24  SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL.

25  *See* Storm Water Permit, Section XII(C)(2)(a)(i)-(ii).

26       72.    A permittee's Level 1 status for a parameter will return to "Baseline

27  Status" once a Level 1 ERA Report has been completed, all identified additional BMPs

28  have been implemented, and results from four (4) consecutive qualified storm events

that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *See* Storm Water Permit, Section XII(C)(2)(b).

73.    A permittee's Level 1 status for any given parameter changes to Level 2 status if sampling results indicate an NAL exceedance for that same parameter while the facility remains in Level 1. Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. *See* Storm Water Permit, Section XII(D). Permitees in Level 2 status must certify and submit via SMARTS their individual Level 2 ERA Action Plan and Technical Report. *See* Storm Water Permit, Section XIV(C)(3).

### B.    The Resource Conservation and Recovery Act

74.    RCRA "is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996).

75.    RCRA prohibits the disposal of solid waste, except at a sanitary landfill or hazardous waste disposal facility. 42 U.S.C. §§ 6945(a), 6903(14).

76.    "Disposal" is defined as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste . . . or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." *Id*. at § 6903(3).

77.    Under RCRA, the definition of "solid waste" is broad and includes "any garbage, refuse, . . . and other discarded material, including solid, liquid, semisolid or contained gaseous material resulting from . . . agricultural operations . . .." *Id*. at § 6903(27).

78.    Congress supplied only a broad definition of "hazardous waste" in the RCRA context, delegating to the EPA the task of promulgating regulations identifying the characteristics of hazardous waste and listing specific wastes as hazardous. *Id.* § 6921.

79.   In accordance with this statutory command, the EPA constructed two avenues through which a waste may be designated as "hazardous."

80.   First, the EPA published several lists of specific hazardous wastes ("Listed Wastes") which describe the wastes and assign a "waste code" to each one. 40 C.F.R. § 261, Subpart D.

81.   Second, the EPA identified four characteristics of hazardous wastes: ignitability, corrosivity, reactivity and toxicity. *Id.* § 261.20-.24. Any solid waste exhibiting one or more of these characteristics is automatically deemed a "hazardous waste" even if it is not a Listed Waste. *United States v. MacDonald*, 339 F.3d 1080, 1082 (2003).

82.   As relevant here, the Facility's leachate includes many Listed Wastes, including, but not limited to, tetrahydrofuran ("THF"), Dioxane, chlorobenzene ("CB"), naphthalene, 1,4-Dichlorobenzene, and carbon disulfide. 40 C.F.R. § 261, Subpart D.

83.   Many of the chemicals in the Facility's leachate exhibit characteristics of hazardous waste and are therefore hazardous, as well. *Id.* §§ 261.20-24.

84.   RCRA provides that:

> Any person may commence a civil action on his own behalf – against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B).

85.   For the reasons stated below, Republic is contributing and has contributed to an imminent and substantial endangerment to human health or the environment.

C.   **Public Nuisance**

86.   Public nuisance is established by showing that the defendant, by acting or failing to act, created a condition that is harmful to health, is indecent or offensive to the senses, or is an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property. Judicial Council of California Jury Instructions (2019) No. 2020.

87.   The condition created must affect a substantial number of people at the same time and must be such that an ordinary person would be reasonably annoyed or disturbed by the condition. *Id*.

88.   Moreover, for a court to find a public nuisance, the seriousness of the harm must outweigh the social utility of defendant's conduct, the plaintiff cannot have consented to the conduct, and the conduct or condition created must have caused the plaintiff to suffer harm that is or was different from that suffered by the general public. *Id*.

89.   A nuisance *per se* occurs when the Legislature declares that a particular act is a nuisance. *Olson v. Beck*, 2011 U.S. Dist. Lexis 114805 at *61 (N.D. Cal. 2011) ("A nuisance *per se* exists where the nuisance is 'legislatively declared.'").

90.   Nuisance *per se* does not require the plaintiff show harm; rather a nuisance *per se* occurs as long as "the conditions specified in the statute or ordinance [defining the nuisance] exist." *Id*. at *62.

91.   As relevant here, local laws declare Republic's past and ongoing leaching and discharging a public nuisance. *See, e.g.,* Richmond Mun. Code § 9.22.090 (defining public nuisance as the "keeping, storage, depositing or accumulation on the premises of any … solid waste, rubbish, and debris, which is within the view of persons on adjacent or nearby real property or the public right-of-way and which poses a risk of harm to the public or constitutes visual blight or reduces the aesthetic appearance of the neighborhood or is offensive to the senses or is detrimental to the use and enjoyment of nearby properties or reduces nearby property values"); Cal. Civil Code § 3479-3480

(defining a nuisance as "[a]nything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway" and a public nuisance as "one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal").

## IV.  <u>STATEMENT OF FACTS</u>

### A.  Site Description, Industrial Activities, and Pollutant Sources at the Facility

92.     The Facility comprises approximately 340 acres and is directly adjacent to Wildcat Marsh, San Pablo Creek, San Pablo Bay, and San Francisco Bay.

93.     The Facility includes a 160-acre, closed Class II solid waste landfill, on top of which there is an active composting operation, and an adjacent 28-acre, closed Class I hazardous waste disposal facility.

94.     The Facility was operated as a Class I hazardous waste disposal facility from 1953 to 1985 and included a 9.5-acre surface impoundment and an 11.5-acre landfill.

95.     The Class I facility was closed in 2003, and a low permeability cover (or cap) was installed during closure activities through 2007.

96.     The Class II landfill reached capacity in September 2006, was deactivated, and received approval for landfill closure when the final cover was completed in 2010.

97.     In addition to the landfill and composting operation, the Facility's ongoing operations include a construction and demolition debris processing area, a waste transfer station, a corrective action management unit, a leachate treatment plant, and a power/cogeneration plant.

98.    The current industrial activities at the Facility fall under Standard Industrial Classification ("SIC") 5093 (for "Scrap and Waste Materials (not including source separated recycling)") and 2875 (for "Fertilizers, Pesticides, etc.").

99.    The Waste Discharger Identification number assigned to the Facility by the Regional Board is 2 07I005532.

100.    The Facility's SWPPP identifies eight drainage areas.

101.    Drainage Area 1, in the northeast corner of the Facility, ultimately flows into San Pablo Bay (via San Pablo Creek).

102.    The rest of the northern portion of the Facility (Drainage Areas 2-8) flows directly into San Pablo Bay.

103.    Stormwater from the central and southern portions of the site, identified by Republic as Drainage Area 9 and encompassing the composting operations, drains into a retention pond ("Pond A"). If Pond A exceeds its capacity, stormwater then flows into an unlined auxiliary retention pond ("Pond B").

104.    The northern portion of Pond A is lined, and the southern Portion of Pond A is unlined.

105.    Pond B was created by constructing berms to separate the Facility from San Francisco Bay and the adjacent tidal marsh to the south.

106.    Pond A receives stormwater flows from much of the Facility, including the Class I landfill, the power/cogeneration plant, and the leachate treatment plant.

107.    When Pond A overflows, stormwater discharges into Pond B.

108.    Other stormwater from Drainage Area 9 is separately conveyed to the unlined portion of Pond A.

**A.  The Facility's Leachate System**

109.    To reduce leachate migration from the Class I and Class II landfills and minimize groundwater outmigration of pollutants, Republic has constructed low-permeability subsurface cutoff walls around much of the Bay-facing perimeter of the Facility. Specifically, between 1977 and 1996, cut off walls (in the form of seepage

control barriers) were constructed around parts of the Facility's perimeter. These cutoff walls fall into two different categories, depending on when they were installed. The original cutoff wall system installed in the late 1970s was composed entirely of local mud and is referred to as the Bay Mud Barrier. Following recommendations from the Regional Board, which regulates the Facility under the Clean Water Act, a system of "slurry" walls was installed in the mid-1980s in a number of key areas around the Facility. These "slurry" walls were intended to augment the Bay Mud Barrier walls.

110.    When it began operating, the Class II landfill had no engineered leachate drainage system installed beneath the landfill.

111.    Due to ongoing subsidence, the base of the landfill is now below the groundwater table (and therefore the mean tide level).

112.    Republic installed a leachate collection and removal system consisting of a series of subsurface drains connected to extraction sumps located adjacent to, but not directly underneath, the Class II landfill. This system was installed between 2007 and 2008.

113.    There are eleven (11) extraction sumps throughout the Facility.

114.    Leachate that is collected using the extraction sumps from the Class II landfill is transferred to an on-site Leachate Treatment Plant, and treated leachate is stored in a 72,000-gallon storage tank.

115.    Treated leachate is ultimately transferred to the City of Richmond's wastewater treatment facility.

116.    The goal of the extraction system is to create a negative or "inward hydraulic gradient" whereby leachate and contaminated groundwater is drawn into the leachate collection system rather than migrating outward into the Impacted Waters.

117.    Nevertheless, the Facility has been unable to maintain this negative or "inward" gradient within the Facility footprint since prior to the approval of the Facility's closure in 2010 to the present, and thus, the Facility has discharged and continues to discharge leachate to the Impacted Waters.

118.   According to the Facility's 2024 Annual Monitoring Report, which documents groundwater monitoring and sample results, leachate flowing outward from the Facility contained concentrations of Dioxane in January and again in August 2024 (and presumably continuously between and after these dates) that exceeded the EPA's established safety limit by more than seventeen (17) times. During this period, the leachate contained other pollutants—including tert-Butyl alcohol ("TBA"), THF, 1,4-Dioxane, methyl-tert-butyl ether ("MTBE"), PFAS/PFOA compounds, CB, dibenzofuran, diethyl ether, di-isopropyl ether, isopropyl benzene, methyl-tert-butyl ether, naphthalene, 2-Methylnaphthalene, 1,1-Dichloroethane, 1,2-Dichlorobenzene, 1,4-Dichlorobenzene, 1,2,4 Trimethylbenzene, 1,3,5-Trimethylbenzene, n-Propyl benzene, phenanthrene, carbon disulfide, tert-amyl methyl ether, cyanide, acenaphthene, arsenic, barium, chromium, copper, nickel, and selenium—at concentrations exceeding regulatory safety thresholds previously determined to be acceptable for the Facility, in many cases surpassing these limits by several orders of magnitude.

119.   These results match those from the Facility's reported exceedances from September 2024, August 2023, February 2023, and August 2020.

120.   Republic has stated that these monitoring results are representative of the Facility's consistent functioning.

121.   Thus, CSPA believes, and herein alleges, that these pollutants have in the past and continue to be discharged in harmful amounts.

**B.  The Facility's Discharges into the Impacted Waters**

122.   The Facility discharges into the Impacted Waters in two ways. First, it discharges pollutant-laden leachate directly into the Impacted Waters through groundwater. These discharges are ongoing and continuous and *are not authorized by the Storm Water Permit*. Second, the Facility discharges stormwater into the Impacted Waters whenever it rains, in violation of the Storm Water Permit.

i.  <u>Facility-Related Leachate Discharges</u>

123.   By Republic's repeated admissions and monitoring data, the Facility has failed and continues to fail to maintain an inward hydraulic gradient along the northern, northeastern, and eastern boundaries of the Facility and as a result allows leachate laden with dangerous organic chemicals and metals to reach the Impacted Waters on a regular basis.

124.   As noted, Republic's monitoring reports regarding the Facility's leachate containment system demonstrate that the Facility has in the past discharged, and continues to discharge, *inter alia,* TBA, THF, 1,4-Dioxane, MTBE, PFAS/PFOA compounds, CB, dibenzofuran, diethyl ether, di-isopropyl ether, isopropyl benzene, methyl-tert-butyl ether, naphthalene, 2-Methylnaphthalene, 1,1-Dichloroethane, 1,2-Dichlorobenzene, 1,4-Dichlorobenzene, 1,2,4 Trimethylbenzene, 1,3,5-Trimethylbenzene, n-Propyl benzene, phenanthrene, carbon disulfide, tert-amyl methyl ether, cyanide, acenaphthene, arsenic, barium, chromium, copper, nickel, and selenium. Many of these chemicals are carcinogenic and/or reprotoxic in humans.

125.   Long-term exposure to many of these chemicals can also cause respiratory issues, eye irritation, gastrointestinal issues, organ failure, and death.

126.   Such discharges of leachate and the chemicals contained therein are not covered by any Clean Water Act permit, including the Storm Water Permit. Therefore, these leachate discharges, flowing into the Impacted Waters, are unpermitted discharges and constitute violations of the Clean Water Act. 33 U.S.C. § 1311(a).

127.   Republic monitors the hydraulic gradient of the leachate using a series of well pairs, situated around the perimeter of both landfill units. Each well pair is comprised of an outward well, which is situated outside the cutoff wall, and an inward well located inside the cutoff wall.

128.   The hydraulic gradient of the leachate is determined by comparing the hydraulic head in the inward well to the hydraulic head measured in the outward well. If the hydraulic head in the outer well is less than the head in the inward well, this indicates a positive (or outward) gradient. An outward gradient provides a pathway for

leachate to commingle with groundwater beneath the landfill and flow outward, into surrounding waters.

129. Republic's publicly-available records have documented a positive/outward gradient at one or more locations along the northeastern and eastern boundaries of the Facility since monitoring began, starting before formal closure in 2010. These observations have routinely included multiple events annually where hydraulic control has not been achieved in the area between monitoring wells M-60 and M-48 along the northeastern portion of the Facility, and during nearly every monitoring event along the eastern boundary of the Facility in the area between monitoring wells E-34R and M-70.

130. Also provided in publicly available operator records is a study completed by a Republic contractor in January 2024. (An excerpt of the study is attached hereto as **Exhibit B**.) The study was completed in response to Regional Board Order No. R2-2022-0011, Provision 5(a) of which requires Republic to complete an investigation and evaluation monitoring to define the nature and extent of contaminants present in groundwater beyond the leachate barrier walls. In the corresponding investigation report, the following is noted in Section 5.1, Finding #4:

> *A laterally extensive sandy interval occurs in borings on the eastern side of the investigation area, which becomes less sandy and more silty toward the west. This interval occurs between approximately 31 and 36 ft. bgs, or similar depth. This unit has been affected by contaminants to a lesser degree than shallower groundwater. However, this unit has the potential to transmit contaminants underneath the barrier, depending on the direction of groundwater flow in that unit.*

131. These observations are consistent with the lithology observed for other Facility well logs located both inside and outside of the slurry wall and for area well logs on adjacent properties.

132.    The soil in this area is comprised of a silty clay mixture interspersed with sand and gravel layers.

133.    The silt, sand, and gravel composition of the soil column facilitates migration of liquid waste downward and laterally.

134.    Given the northeastern and eastern portions of the Facility are where an inward gradient has never been fully maintained, a complete pathway for leachate to impact surface and groundwater becomes clear when the following are considered together: a) regularly observed positive / outflow gradient, b) stratigraphy that lends to the migration of leachate beneath the slurry wall, and c) as discussed in more detail below, numerous exceedances of regulatory compliance limits for chemicals of concern in the northeastern and eastern region of the Facility.

135.    Combined with recurring seeps forming within the landfill (evidencing a failure to maintain the required hydraulic gradient), these lines of evidence confirm that a migration pathway for contaminants not only exists but is also allowing the ongoing transport of solid water and hazardous and toxic chemicals outside the leachate collection system, beyond the slurry wall, and into the Impacted Waters.

136.    Leachate from the Facility discharges to the Impacted Waters via groundwater. This pathway constitutes a functional equivalent of a point source discharge. *Cty. Of Maui v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1465 (2020).

137.    CSPA thus believes and thereon alleges that the Facility has unlawfully discharged toxic leachate every day since May 2, 2020, in violation of the Clean Water Act.

138.    Given the number of toxic and carcinogenic pollutants in the Facility's leachate, these discharges are particularly harmful and problematic.

ii.    Facility-Related Stormwater Discharges

139.    Plaintiff is informed and believes, and thereon alleges, that stormwater that falls on the Facility becomes contaminated by the landfill and other waste material onsite (thus becoming "contaminated stormwater" as defined by 40 C.F.R. § 445.2(b))

and then discharges directly to San Pablo Bay and San Francisco Bay from the northern and northeastern portion of the Facility. *Sierra Club*, 813 F.2d at 1493. Every day that the Facility discharges contaminated stormwater, Republic has violated and violates the Storm Water Permit's Discharge Prohibitions. *See* Storm Water Permit, § III.B.

140.  The Facility's discharge monitoring reports have documented regular discharges of COD, N+N, phosphorous, iron, copper, and aluminum exceeding the relevant NALs.

**Table 1**

| Pollutant | Date | Monitoring Well | Annual NAL (mg/L)[1] | Effluent Data (mg/L)[2] |
|---|---|---|---|---|
| Iron | Dec. 13, 2024 | WCL-8 | 1.00 | 1.2 mg/L |
| | Nov. 21, 2024 | WCL-8 | 1.00 | 1.8 mg/L |
| | Nov. 9, 2023 | WCL-8 | 1.00 | 1.2 mg/L |
| | Feb. 24, 2023 | WCL-11C | 1.00 | 1.9 mg/L |
| | Feb. 3, 2023 | WCL-8 | 1.00 | 1.6 mg/L |
| | Dec. 27, 2022 | WCL-8 | 1.00 | 2.7 mg/L |
| | Dec. 1, 2022 | WCL-8 | 1.00 | 1.8 mg/L |
| | Dec. 1, 2022 | WCL-11C | 1.00 | 19.0 mg/L |
| | Dec. 22, 2021 | WCL-8 | 1.00 | 2.2 mg/L |
| Aluminum | Dec. 13, 2024 | WCL-8 | 0.75 | 1.0 mg/L |
| | Nov. 21, 2024 | WCL-8 | 0.75 | 1.5 mg/L |
| | Nov. 9, 2023 | WCL-8 | 0.75 | 0.84 mg/L |
| | Feb. 24, 2023 | WCL-11C | 0.75 | 1.9 mg/L |
| | Feb. 3, 2023 | WCL-8 | 0.75 | 1.1 mg/L |
| | Dec. 27, 2022 | WCL-8 | 0.75 | 1.9 mg/L |
| | Dec. 1, 2022 | WCL-8 | 0.75 | 1.4 mg/L |
| | Dec. 1, 2022 | WCL-11C | 0.75 | 15.0 mg/L |
| | Dec. 22, 2021 | WCL-8 | 0.75 | 1.3 mg/L |
| | Dec. 22, 2021 | WCL-11J | 0.75 | 0.092 mg/L |
| N+N | Feb. 13, 2025 | WCL-11G | 0.68 | 6.1 mg/L |
| | Feb. 13, 2025 | WCL-11A | 0.68 | 2.6 mg/L |
| | Feb. 13, 2025 | WCL-11D | 0.68 | 40 mg/L |
| | Feb. 13, 2025 | WCL-11C | 0.68 | 29 mg/L |
| | Feb. 13, 2025 | WCL-11F | 0.68 | 11 mg/L |

---

[1] "Mg" stands for milligrams; "L" stands for liter. This unit does not apply to pH below.
[2] This data accounts only for the Facility's effluent discharge data (*i.e.,* run-off) and does not account for run-on.

| | | | |
|---|---|---|---|
| Feb. 13, 2025 | WCL-11E | 0.68 | 27 mg/L |
| Feb. 13, 2025 | WCL-11J | 0.68 | 36 mg/L |
| Nov. 21, 2024 | WCL-8 | 0.68 | 0.95 mg/L |
| March 1, 2024 | WCL-11C | 0.68 | 10 mg/L |
| March 1, 2024 | WCL-11D | 0.68 | 7.1 mg/L |
| March 1, 2024 | WCL-11E | 0.68 | 22 mg/L |
| March 1, 2024 | WCL-11J | 0.68 | 22 mg/L |
| Feb. 1, 2024 | WCL-8 | 0.68 | 1.8 mg/L |
| Feb. 1, 2024 | WCL-11A | 0.68 | 6.3 mg/L |
| Feb. 1, 2024 | WCL-11C | 0.68 | 29 mg/L |
| Feb. 1, 2024 | WCL-11D | 0.68 | 51 mg/L |
| Feb. 1, 2024 | WCL-11E | 0.68 | 24 mg/L |
| Feb. 1, 2024 | WCL-11J | 0.68 | 18 mg/L |
| Feb. 1, 2024 | WCL-11F | 0.68 | 22 mg/L |
| Feb. 1, 2024 | WCL-11G | 0.68 | 8.6 mg/L |
| March 10, 2023 | WCL-11F | 0.68 | 23 mg/L |
| March 10, 2023 | WCL-11G | 0.68 | 5.1 mg/L |
| March 10, 2023 | WCL-11D | 0.68 | 31 mg/L |
| March 10, 2023 | WCL-8 | 0.68 | 5.3 mg/L |
| March 10, 2023 | WCL-11J | 0.68 | 13 mg/L |
| March 10, 2023 | WCL-11E | 0.68 | 3.6 mg/L |
| March 10, 2023 | WCL-11C | 0.68 | 29 mg/L |
| Feb. 1, 2023 | WCL-11D | 0.68 | 30 mg/L |
| Feb. 1, 2023 | WCL-8 | 0.68 | 1.8 mg/L |
| Dec. 27, 2022 | WCL-11G | 0.68 | 58 mg/L |
| Dec. 27, 2022 | WCL-8 | 0.68 | 24 mg/L |
| Dec. 27, 2022 | WCL-11A | 0.68 | 22 mg/L |
| Dec. 27, 2022 | WCL-11C | 0.68 | 120 mg/L |
| Dec. 27, 2022 | WCL-11D | 0.68 | 150 mg/L |
| Dec. 27, 2022 | WCL-11E | 0.68 | 70 mg/L |
| Dec. 27, 2022 | WCL-11F | 0.68 | 42 mg/L |
| Dec. 27, 2022 | WCL-11J | 0.68 | 70 mg/L |
| Dec. 1, 2022 | WCL-11C | 0.68 | 5.2 mg/L |
| Dec. 22, 2021 | WCL-11C | 0.68 | 150 mg/L |
| Dec. 22, 2021 | WCL-11D | 0.68 | 130 mg/L |
| Dec. 22, 2021 | WCL-11G | 0.68 | 34 mg/L |
| Dec. 22, 2021 | WCL-11J | 0.68 | 130 mg/L |
| Dec. 22, 2021 | WCL-11E | 0.68 | 120 mg/L |
| Dec. 22, 2021 | WCL-11A | 0.68 | 21 mg/L |
| Dec. 22, 2021 | WCL-8 | 0.68 | 6 mg/L |

| | | | | |
|---|---|---|---|---|
| | Oct. 21, 2021 | WCL-11C | 0.68 | 1.4 mg/L |
| | Oct. 21, 2021 | WCL-8 | 0.68 | 1.4 mg/L |
| | Oct. 21, 2021 | WCL-11G | 0.68 | 3.2 mg/L |
| **COD** | Feb. 13, 2025 | WCL-11D | 120 mg/L | 230 mg/L |
| | Feb. 13, 2025 | WCL-11C | 120 mg/L | 200 mg/L |
| | Feb. 13, 2025 | WCL-11F | 120 mg/L | 150 mg/L |
| | Feb. 13, 2025 | WCL-11E | 120 mg/L | 220 mg/L |
| | Feb. 13, 2025 | WCL-11J | 120 mg/L | 220 mg/L |
| | Dec. 13, 2024 | WCL-11E | 120 mg/L | 160 mg/L |
| | Dec. 13, 2024 | WCL-11J | 120 mg/L | 180 mg/L |
| | March 1, 2024 | WCL-11C | 120 mg/L | 230 mg/L |
| | March 1, 2024 | WCL-11D | 120 mg/L | 170 mg/L |
| | March 1, 2024 | WCL-11J | 120 mg/L | 200 mg/L |
| | Feb. 1, 2024 | WCL-11C | 120 mg/L | 190 mg/L |
| | Feb. 1, 2024 | WCL-11D | 120 mg/L | 250 mg/L |
| | Feb. 1, 2024 | WCL-11E | 120 mg/L | 240 mg/L |
| | Feb. 1, 2024 | WCL-11J | 120 mg/L | 200 mg/L |
| | Feb. 1, 2024 | WCL-11F | 120 mg/L | 160 mg/L |
| | Feb. 1, 2024 | WCL-11G | 120 mg/L | 170 mg/L |
| | March 10, 2023 | WCL-11F | 120 mg/L | 280 mg/L |
| | March 10, 2023 | WCL-11G | 120 mg/L | 190 mg/L |
| | March 10, 2023 | WCL-11D | 120 mg/L | 300 mg/L |
| | March 10, 2023 | WCL-11J | 120 mg/L | 230 mg/L |
| | March 10, 2023 | WCL-11E | 120 mg/L | 230 mg/L |
| | March 10, 2023 | WCL-11C | 120 mg/L | 220 mg/L |
| | Feb. 1, 2023 | WCL-11D | 120 mg/L | 190 mg/L |
| | Dec. 27, 2022 | WCL-11G | 120 mg/L | 180 mg/L |
| | Dec. 27, 2022 | WCL-8 | 120 mg/L | 150 mg/L |
| | Dec. 27, 2022 | WCL-11C | 120 mg/L | 260 mg/L |
| | Dec. 27, 2022 | WCL-11D | 120 mg/L | 290 mg/L |
| | Dec. 27, 2022 | WCL-11E | 120 mg/L | 220 mg/L |
| | Dec. 27, 2022 | WCL-11F | 120 mg/L | 170 mg/L |
| | Dec. 27, 2022 | WCL-11J | 120 mg/L | 280 mg/L |
| | Dec. 1, 2022 | WCL-11C | 120 mg/L | 210 mg/L |
| | Dec. 22, 2021 | WCL-11C | 120 mg/L | 210 mg/L |
| | Dec. 22, 2021 | WCL-11D | 120 mg/L | 210 mg/L |
| | Dec. 22, 2021 | WCL-11G | 120 mg/L | 190 mg/L |
| | Dec. 22, 2021 | WCL-11J | 120 mg/L | 230 mg/L |
| | Dec. 22, 2021 | WCL-11E | 120 mg/L | 230 mg/L |
| | Oct. 21, 2021 | WCL-8 | 120 mg/L | 850 mg/L |

| | Oct. 21, 2021 | WCL-11G | 120 mg/L | 160 mg/L |
|---|---|---|---|---|
| **Phosphorous** | Feb. 13, 2025 | WCL-11F | 2.0 mg/L | 3.3 mg/L |
| | Feb. 13, 2025 | WCL-11F | 2.0 mg/L | 2.6 mg/L |
| | Feb. 13, 2025 | WCL-11D | 2.0 mg/L | 2.1 mg/L |
| | Feb. 13, 2025 | WCL-11C | 2.0 mg/L | 2.4 mg/L |
| | March 1, 2024 | WCL-11J | 2.0 mg/L | 2.6 mg/L |
| | Feb. 1, 2024 | WCL-11D | 2.0 mg/L | 2.1 mg/L |
| | Feb. 1, 2024 | WCL-11J | 2.0 mg/L | 4.1 mg/L |
| | March 10, 2023 | WCL-11F | 2.0 mg/L | 3.6 mg/L |
| | March 10, 2023 | WCL-11G | 2.0 mg/L | 2.4 mg/L |
| | March 10, 2023 | WCL-11D | 2.0 mg/L | 3.6 mg/L |
| | March 10, 2023 | WCL-11J | 2.0 mg/L | 4.2 mg/L |
| | March 10, 2023 | WCL-11E | 2.0 mg/L | 2.9 mg/L |
| | March 10, 2023 | WCL-11C | 2.0 mg/L | 3 mg/L |
| | Dec. 27, 2022 | WCL-11C | 2.0 mg/L | 2.4 mg/L |
| | Dec. 27, 2022 | WCL-11J | 2.0 mg/L | 2.8 mg/L |
| | Dec. 22, 2021 | WCL-11J | 2.0 mg/L | 3 mg/L |
| | Dec. 22, 2021 | WCL-11E | 2.0 mg/L | 3 mg/L |
| | Oct. 21, 2021 | WCL-8 | 2.0 mg/L | 2.2 mg/L |
| **Copper** | Feb. 13, 2025 | WCL-11G | 0.0332 mg/L | 0.042 mg/L |
| | Feb. 13, 2025 | WCL-11D | 0.0332 mg/L | 0.057 mg/L |
| | Feb. 13, 2025 | WCL-11C | 0.0332 mg/L | 0.044 mg/L |
| | Feb. 13, 2025 | WCL-11F | 0.0332 mg/L | 0.044 mg/L |
| | Feb. 13, 2025 | WCL-11E | 0.0332 mg/L | 0.036 mg/L |
| | Feb. 13, 2025 | WCL-11J | 0.0332 mg/L | 0.034 mg/L |
| | Dec. 13, 2024 | WCL-11J | 0.0332 mg/L | 0.036 mg/L |
| | March 1, 2024 | WCL-11C | 0.0332 mg/L | 0.048 mg/L |
| | March 1, 2024 | WCL-11E | 0.0332 mg/L | 0.041 mg/L |
| | Feb. 24, 2023 | WCL-11C | 0.0332 mg/L | 0.034 mg/L |
| | Dec. 27, 2022 | WCL-11C | 0.0332 mg/L | 0.052 mg/L |
| | Dec. 27, 2022 | WCL-11D | 0.0332 mg/L | 0.043 mg/L |
| | Dec. 1, 2022 | WCL-11C | 0.0332 mg/L | 0.058 mg/L |
| | Jan. 4, 2022 | WCL-11E | 0.0332 mg/L | 0.045 mg/L |
| | Jan. 4, 2022 | WCL-11D | 0.0332 mg/L | 0.036 mg/L |
| | Jan. 4, 2022 | WCL-11C | 0.0332 mg/L | 0.046 mg/L |
| | Jan. 4, 2022 | WCL-11J | 0.0332 mg/L | 0.041 mg/L |
| | Dec. 22, 2021 | WCL-11E | 0.0332 mg/L | 0.37 /L |

141.   Plaintiff is informed and believes, and thereon alleges, that during and/or after every significant rain event at the Facility since May 2, 2020, through the present, the Facility has discharged and continues to discharge stormwater that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the technology-based Effluent Limitations, and/or other Water Quality Standards.

142.   According to weather data from the National Oceanic and Atmospheric Administration ("NOAA"), there have been approximately 169 rain events of 0.1 inches or greater (within a single day) since May 2, 2020. This information is included as Attachment C to the Notice Letter, which is attached hereto as **Exhibit A**.

143.   These discharges contribute to the harmful algal blooms that have and continue to plague the San Pablo and San Francisco Bays. Given that harmful algal blooms are currently a major water quality problem facing the San Francisco Bay, the Facility's discharges of these pollutants are particularly concerning.

**C.  Republic's Failure to Implement BAT and BCT**

144.   The Storm Water Permit requires dischargers to implement adequate best management practices that fulfill the BAT/BCT requirements of the Clean Water Act to reduce or prevent discharges of pollutants in their stormwater discharges. Storm Water Permit Section V.A. To meet the BAT/BCT standard, dischargers must implement minimum best management practices and any advanced best management practices set forth in the Storm Water Permit's SWPPP Requirements provisions where necessary to reduce or prevent pollutants in discharges. Storm Water Permit Sections X.H.1-2. Sampling results that are orders of magnitude in excess of EPA Benchmark levels, such as those reported by Republic here, are presumptive evidence that Republic has not and does not implement best management practices that achieve BAT/BCT. *Santa Monica Baykeeper,* 619 F.Supp.2d at 920-924.

145.   As evidenced by the discharges accounted for in Table 1, above, the Facility has consistently discharged multiple pollutants well in excess of relevant

NALs, and Republic has not and does not implement best management practices that achieve BAT/BCT.

**D. Failure to Implement an Adequate Monitoring Implementation Plan**

146.  Republic's reports demonstrate that Republic has failed to sample and analyze for several landfill-specific pollutants in its stormwater.

147.  Republic must test for and control discharges of certain constituents that are expected to be in landfill-related wastewater. 40 C.F.R. §§ 445.21-23. Yet, the stormwater sampling results from the Facility demonstrate that Republic has failed to test for ammonia, benzoic acid, p-cresol, and α-terpineol throughout the last five (5) years, as required by the landfill-specific ELGs identified above.

148.  This ongoing failure to conduct the required sampling and analysis constitutes a violation of the Storm Water Permit and a failure by Republic to adequately execute a Monitoring Implementation Plan.

149.  Likewise, Republic has failed to sample and analyze its stormwater for other chemical constituents known to be present in the Facility's leachate, including TBA, THF, 1,4-Dioxane, MTBE, PFAS/PFOA compounds, CB, dibenzofuran, diethyl ether, di-isopropyl ether, isopropyl benzene, methyl-tert-butyl ether, naphthalene, 2-Methylnaphthalene, 1,1-Dichloroethane, 1,2-Dichlorobenzene, 1,4-Dichlorobenzene, 1,2,4 Trimethylbenzene, 1,3,5-Trimethylbenzene, n-Propyl benzene, phenanthrene, carbon disulfide, tert-amyl methyl ether, cyanide, acenapthene, arsenic, barium, chromium, nickel, and selenium, each of which has been identified as present in the Facility's leachate-contaminated groundwater migrating to the Impacted Waters. This too constitutes a violation of the Storm Water Permit. Storm Water Permit, Section XI.B.6.

150.  Republic has failed to adequately sample every stormwater discharge point when conducting sampling, in violation of the Storm Water Permit and Clean Water Act on multiple occasions throughout the last five years. Storm Water Permit, Section XI.A.1 and 2.

**E.  Republic's Failure to Develop and Implement an Adequate SWPPP**

151.  CSPA is informed by Republic's own reports, and thereon believes and herein alleges, that the Facility is subject to ERA Level 2 controls for copper, COD, aluminum, iron, N+N and phosphorous.

152.  Yet, Republic's own self-reported sampling data from February 2025 show that the Facility continues to discharge stormwater with concentrations of copper, iron, aluminum, N+N, and COD in excess of the relevant NALs (sometimes by several orders of magnitude).

153.  This demonstrates that the modifications Republic has committed to as part of its most recent SWPPP are not adequate to reduce its discharges below NAL levels and bring the Facility into compliance (and out of ERA Level 2).

154.  This violates the Storm Water Permit and establishes that the Facility's SWPPP remains inadequate as a matter of law.

**F.  Republic's Failure to Develop and Implement an ERA Action Plan**

155.  Based on the Facility's stormwater sampling results (summarized in Table 1, *supra*), the Facility entered ERA Level 1 for phosphorus on July 1, 2022.

156.  The Facility entered ERA Level 2 for phosphorus on July 1, 2023.

157.  Defendants have not filed any of the ERA reporting required by the Storm Water Permit for phosphorus.

**G.  RCRA Violations**

158.  Since the material at issue here is leachate from a landfill, it is solid a "solid waste" under RCRA. 42 U.S.C. § 6903(27).

159.  Further, because, as noted, many of the chemicals referenced above are Listed Wastes, the Facility's leachate constitutes "hazardous waste" under RCRA. 40 C.F.R. § 261, Subpart D; *see also Union Pac. R.R. Co. v. Hill*, 2021 U.S. Dist. LEXIS 240524, at *5 (N.D. Cal. Dec. 16, 2021) (RCRA imminent and substantial endangerment case involving a leak of Dioxane, among other chemicals); *Homefed Vill. III Master, LLC v. Otay Landfill, Inc.*, 2023 U.S. Dist. LEXIS 120204, at *12 (S.D.

Cal. July 11, 2023) (RCRA imminent and substantial endangerment case involving leachate that contained MTBE).

160.   Since the leachate has been and continues to leach out from the Facility, CSPA believes and herein alleges that Republic's actions have created and continue to present an imminent and substantial endangerment under RCRA. *United States v. Waste Industries, Inc.,* 734 F.2d 159 (4th Cir. 1984); *Ethyl Corp. v. EPA,* 176 U.S. App. D.C. 373, 541 F.2d 1, 13 (D.C. Cir.) (*en banc*), *cert. denied,* 426 U.S. 941 (1976).

161.   The Facility's leachate poses a serious environmental and public health threat. The Facility has also failed and continues to fail to maintain an inward hydraulic gradient in the Class I landfill, causing leachate from the Class I landfill to discharge intermittently into the Class II landfill. (Attached hereto as **Exhibit C** are maps prepared by Republic and provided to regulators from 2015 to present that demonstrate that Republic has unlawfully discharged leachate from the Facility every month since August 21, 2015.)

**H.  The Facility Constitutes a Public Nuisance**

162.   The Facility's ongoing and consistent discharge of toxic and carcinogenic pollutants on leachate to groundwater and into the Impacted Waters constitutes a nuisance *per se. Beck*, 2011 U.S. Dist. Lexis 114805 at *61; Richmond Mun. Code § 9.22.090.

163.   The Facility stores solid waste nearby to public rights of way, including public waters and a trail, in such a way as to pose a risk of harm to the public and to be offensive to the senses and detrimental to the public's use and enjoyment of the San Pablo and San Francisco Bays. Richmond Mun. Code § 9.22.090.

164.   Moreover, Republic's past and ongoing stormwater discharges contribute to the harmful algal bloom problem plaguing these waters.

165.   The seriousness of these harms outweigh the social utility of Republic's conduct. Although storing such wastes may be an important social function, doing so unlawfully and adjacent to San Pablo Bay and San Francisco Bay is not, and neither is

1    the Republic's failure to adequately create and maintain the inward hydraulic gradient

2    mandated by regulators.

3        166.   CSPA did not consent to Republic's conduct in this respect.

4        167.   CSPA, by and through its members, has been and is being harmed in a

5    manner different and more significant than the general public. As noted, members of

6    CSPA enjoy the waters that the Facility discharges into, including San Pablo Bay, for

7    fishing and for wildlife viewing. By polluting these waters and harming the wildlife

8    therein, Republic impedes these members' interests in continuing to use the Impacted

9    Waters for these purposes.

10   **IV.  CLAIMS FOR RELIEF**

11              **FIRST CAUSE OF ACTION**

12   **Unpermitted Discharges of Leachate in Violation of**
     **the Clean Water Act, 33 U.S.C. § 1311(a).**
13

14       168.   Plaintiff incorporates the allegations contained in the above paragraphs as

15   though fully set forth herein.

16       169.   Plaintiff is informed and believes, and thereon alleges, that Republic has

17   discharged and continues to discharge leachate from the Class I and Class II landfills

18   at the Facility, via subsurface migration, into the Impacted Waters.

19       170.   Plaintiff is informed and believes, and thereon alleges, that these

20   discharges are not covered by an NPDES permit and are ongoing and continuous

21   violations of the Clean Water Act.

22       171.   Each day, since at least May 2, 2020, that Republic discharges pollutants

23   without a permit is a separate and distinct violation of Section 301(a) of the Clean

24   Water Act, 33 U.S.C. § 1311(a).

25       172.   By committing the acts and omissions alleged above, Republic is subject

26   to an assessment of civil penalties for each and every violation of the Clean Water Act

27   occurring from May 2, 2020, to the present, pursuant to Sections 309(d) and 505 of the

28   Clean Water Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

173.   An action for injunctive relief is authorized by Clean Water Act Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm Plaintiff have no plain, speedy, or adequate remedy at law.

174.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

175.   WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## SECOND CAUSE OF ACTION

**Discharges of Contaminated Stormwater and Leachate in Violation of the Storm Water Permit's Discharge Prohibitions and the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

176.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

177.   Plaintiff is informed and believes, and thereon alleges, that Republic has and is discharging non-stormwater, including but not limited to leachate, in violation of the Storm Water Permit's Discharge Prohibitions.

178.   Plaintiff is informed and believes, and thereon alleges, that Republic's violations of Effluent Limitations of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

179.   Each day, since at least May 2, 2020, that Republic discharges non-stormwater in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

180.   By committing the acts and omissions alleged above, Republic is subject to an assessment of civil penalties for each and every violation of the Clean Water Act

occurring from May 2, 2020, to the present, pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

181.  An action for injunctive relief is authorized by Clean Water Act Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm Plaintiff have no plain, speedy, or adequate remedy at law.

182.  An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

183.  WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## THIRD CAUSE OF ACTION
### Republic's Failure to Implement BAT and BCT
### in Violation of the Storm Water Effluent Limitations and the Clean Water Act.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

184.  Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

185.  Plaintiff is informed and believes, and thereon alleges, that Republic has failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of best management practices that achieve BAT/BCT.

186.  Plaintiff is informed and believes, and thereon alleges, that discharges of stormwater containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time stormwater discharges from the Facility.

187.    Republic violates and will continue to violate the Storm Water Permit's Effluent Limitations each and every time stormwater containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

188.    Plaintiff therefore believes, and thereon alleges, that Republic has failed to implement the BMPs required by the Storm Water Permit. Storm Water Permit, Sections X(H)(1)(a)–(g). This failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Storm Water Permit and the Clean Water Act. Storm Water Permit, Sections I(D) (Finding 32) V(A); 33 U.S.C. § 1311(b).

189.    By committing the acts and omissions alleged above, Republic is subject to an assessment of civil penalties for each and every violation of the Clean Water Act occurring from May 2, 2020, to the present, pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

190.    An action for injunctive relief is authorized by Clean Water Act Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm Plaintiff have no plain, speedy, or adequate remedy at law.

191.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

192.    WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

**FOURTH CAUSE OF ACTION**
**Republic's Failure to Adequately Develop, Implement, and/or**
**Revise a Monitoring and Reporting Plan in Violation of**
**the Storm Water Permit and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

193.  Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

194.  Plaintiff is informed and believes, and thereon alleges, that Republic has failed and continues to fail to develop an adequate Monitoring Implementation Plan for the Facility, in violation of the Storm Water Permit.

195.  Republic has failed to sample and analyze for several landfill-specific pollutants in its stormwater. 40 C.F.R. §§ 445.21-23.

196.  Republic has failed to test for ammonia, benzoic acid, p-cresol, and α-terpineol throughout the last five (5) years, as required by the landfill-specific ELGs identified above.

197.  Likewise, Republic has failed to sample its stormwater for the chemical constituents known to be present in the Facility's leachate-contaminated stormwater.

198.  Republic has on several occasions failed to adequately sample every stormwater discharge point when conducting sampling, in violation of the Storm Water Permit and Clean Water Act throughout the last five years. Storm Water Permit, Section XI.A.1 and 2.

199.  By committing the acts and omissions alleged above, Republic is subject to an assessment of civil penalties for each and every violation of the Clean Water Act occurring from May 2, 2020, to the present, pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

200.  An action for injunctive relief under the Clean Water Act is authorized by Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

201.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

202.   WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

### FIFTH CAUSE OF ACTION
**Republic's Failure to Adequately Develop and Implement a SWPPP in Violation of the Storm Water Permit and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

203.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

204.   Plaintiff is informed and believes, and thereon alleges, that Republic has failed to develop and/or implement a SWPPP this is adequate to reduce its discharges below NAL levels and bring the Facility into compliance (and out of ERA Level 2).

205.   By committing the acts and omissions alleged above, Republic is subject to an assessment of civil penalties for each and every violation of the Clean Water Act occurring from May 2, 2020, to the present, pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

206.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

207.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

208.   WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## SIXTH CAUSE OF ACTION

**Republic's Failure to Develop and Implement an ERA Plan in Violation of the Storm Water Permit and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

209.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

210.   Plaintiff is informed and believes, and thereon alleges that Republic has failed to conduct any ERA reporting, although it entered Level 1 for discharges of phosphorus on July 1, 2022, and Level 2 for phosphorus on July 2, 2023.

211.   Republic's failure to file ERA reports after the Facility's self-reported discharge monitoring reports showed exceedances of NALs for phosphorous constitute violations of the Storm Water Permit and therefore the Clean Water Act. Storm Water Permit Section XII(C)(1)(a)-(c).

212.   By committing the acts and omissions alleged above, Republic is subject to an assessment of civil penalties for each and every violation of the Clean Water Act occurring from July 1, 2022, to the present, pursuant to Sections 309(d) and 505 of the Clean Water Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

213.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

214.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

215.   WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

**SEVENTH CAUSE OF ACTION**
**Imminent and Substantial Endangerment in Violation of the Resource Conservation and Recovery Act.**
**42 U.S.C. § 6972**

216.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

217.   Plaintiff is informed and believes and thereon alleges that Republic has failed to maintain the required negative or inward hydraulic gradient within the Facility footprint since prior to the approval of the Facility's closure in 2010 to the present.

218.   Plaintiff is thus informed and therefore believes and herein alleges that the Facility has in the past and continues to leach leachate into groundwater that is interconnected with the Impacted Waters and into the Impacted Waters directly.

219.   The leachate is from a landfill and is therefore a "solid waste" under RCRA. 42 U.S.C. § 6903(27).

220.   Further, because many of the chemicals in the leachate are Listed Wastes, the Facility's leachate constitutes "hazardous waste" under RCRA. 40 C.F.R. § 261, Subpart D; *see also Union Pac. R.R. Co.,* 2021 U.S. Dist. LEXIS 240524, at *5; *Homefed Vill. III Master, LLC*, 2023 U.S. Dist. LEXIS 120204, at *12.)

221.   By repeatedly leaching toxic leachate into groundwaters interconnected with the Impacted Waters and into the Impacted Waters directly over so many years, the Facility has created and continues to constitute an imminent and substantial endangerment under RCRA because it poses a serious environmental and public health threat. *Ethyl Corp.,* 541 F.2d at 13.

222.   Republic is therefore subject to an assessment of civil penalties for each and every violation of RCRA occurring from May 2, 2020, to the present. 42 U.S.C. § 6928(g).

223.   An action for injunctive relief under RCRA is authorized by also authorized. 42 U.S.C. § 6972(a)(1)(B). Plaintiff, its members, and the public have been, continue to be, and will continue to be irreparably harmed by the imminent and

substantial endangerment created and maintained by Republic unless an injunction requiring Republic to remedy this situation is issued. Plaintiff has no other no plain, speedy, or adequate remedy at law.

224.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

225.   WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## EIGHTH CAUSE OF ACTION
### Public Nuisance

226.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

227.   To establish a public nuisance, a plaintiff must show that (1) the defendant, by acting or failing to act, created a condition that is harmful to health, is indecent or offensive to the senses, or is an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, (2) condition created affects a substantial number of people at the same time, (3) condition created is such that an ordinary person would be reasonably annoyed or disturbed by the condition, (4) the seriousness of the harms caused by condition created outweigh the social utility of defendant's conduct, (5) the plaintiff did not consent to the defendant's conduct, and (6) the plaintiff to suffered harm that is or was different from that suffered by the general public. Judicial Council of California Jury Instructions (2019) No. 2020.

228.   Plaintiff is informed and believes, and thereon alleges, that the first element of public nuisance is met here because the Facility's ongoing and consistent discharge of toxic and carcinogenic pollutants into San Pablo Bay and San Francisco Bay constitutes a nuisance *per se,* since the Facility stores solid waste nearby to public rights of way, including public waters, in such a way as to pose a risk of harm to the public, to be offensive to peoples' senses, and to impair the public's use and enjoyment

of San Pablo and San Francisco Bays. *Beck*, 2011 U.S. Dist. Lexis 114805 at *61;
Richmond Mun. Code § 9.22.090.

229. Nevertheless, even if its conduct were not statutorily classified (and classifiable) as a public nuisance, Plaintiff is informed and believes and herein alleges that the first element of public nuisance would still be met here because, as stated already, the Facility's ongoing and consistent discharge of toxic and carcinogenic pollutants into San Pablo Bay and San Francisco Bay constitute a nuisance under the standard calculus. Judicial Council of California Jury Instructions (2019) No. 2020.

230. The chemicals in the Facility's leachate and stormwater discharges are carcinogenic and/or reprotoxic in humans, and exposure to many of such chemicals can also cause respiratory issues, eye irritation, gastrointestinal issues, organ failure, and death (and are therefore offensive to the senses). The Facility's past and ongoing discharges, therefore, create and exacerbate conditions in and around the Impacted Waters in a manner harmful to health and indecent to the senses.

231. Moreover, Republic's past and ongoing stormwater discharges contribute to the harmful algal bloom problem plaguing the Impacted Waters.

232. Plaintiff is informed and believes, and thereon alleges, that the second element of public nuisance is met here because the Facility's ongoing and consistent discharge of toxic and carcinogenic pollutants into San Pablo Bay and San Francisco Bay affects a substantial number of people at the same time. Plaintiff is informed and believes, and thereon alleges, that many people recreate in and around the Impacted Waters in the vicinity of the Facility on a regular basis and that many people fish for fish in the area (that absorb toxics discharged into the Impacted Waters by Republic).

233. An ordinary person would be reasonably annoyed or disturbed by this condition; most people would be disturbed to find out that a landfill directly adjacent to the San Francisco Bay and San Pablo Bay has been for years and continues to discharge large quantities and high concentrations of chemicals known to cause cancer and reproductive issues.

234. The seriousness of these harms far outweigh the social utility of Republic's conduct. Although storing such wastes is an important social function, doing so adjacent to the San Pablo Bay and San Francisco Bay is not, and neither is the Republic's failure to adequately create and maintain the inward gradient mandated by regulators.

235. CSPA did not consent to Republic's conduct in this respect.

236. CSPA, by and through its members, has been and is being harmed in a manner different and more significant than the general public. As noted, members of CSPA enjoy the waters that the Facility discharges into, including San Pablo Bay, for fishing and for wildlife viewing. By polluting these waters and harming the wildlife therein, Republic impedes these members' interests in continuing to use the Impacted Waters for these purposes.

237. WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## VII.  RELIEF REQUESTED

238. Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.  A Court order declaring Republic to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b) and 1342,(p);

b.  A Court order enjoining Republic from further violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342;

c.  A Court order declaring Republic to have violated and to be in violation of RCRA, 42 U.S.C. § 6972(a)(1)(B);

d.  A Court order enjoining Republic from further violating RCRA and to eliminate the imminent and substantial endangerment;

e.  A Court order declaring that Republic has created a public nuisance

1  at the Facility;

2      f.      A Court order requiring Republic to remedy the public nuisance it

3  has created and continues to maintain and enjoining Republic from continuing to create

4  the conditions giving rise to the public nuisance alleged *supra*;

5      g.      A Court order assessing civil monetary penalties for each violation

6  of the Clean Water Act occurring on or after May 2, 2020, as permitted by 33 U.S.C. §

7  1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

8      h.      A Court order assessing civil monetary penalties for each violation

9  of RCRA occurring on or after May 2, 2020, as permitted by 42 U.S.C. § 6928(g) and

10  Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

11      i.      A Court order awarding Plaintiff its reasonable costs of suit,

12  including attorney, witness, expert, and consultant fees, as permitted by Section 505(d)

13  of the Clean Water Act, 33 U.S.C. § 1365(d), RCRA, 42 U.S.C. § 6972(e), and

14  California Code of Civil Procedure § 1021.5;

15      j.      Declaratory relief pursuant to 28 U.S.C. § 2201; and

16      k.      Any other relief as this Court may deem appropriate.

17  Dated: September 26, 2025        Respectfully submitted,
18                                  LAW OFFICES OF ANDREW L. PACKARD

19

20                                  Andrew Packard
21                                  Attorneys for Plaintiff

22                                  AQUA TERRA AERIS LAW GROUP

23                                  /s/ Erica A. Maharg

24                                  Erica A. Maharg
25                                  Attorneys for Plaintiff

26

27

28