ERICA A. MAHARG (Bar No. 279396)
Email: eam@atalawgroup.com
AQUA TERRA AERIS LAW GROUP
8 Rio Vista Ave.
Oakland, CA 94611
Telephone: (415) 568-5200

ANDREW L. PACKARD (Bar No. 168690)
Email: andrew@packardlawoffices.com
LAW OFFICES OF ANDREW L. PACKARD
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Telephone: (707) 782-4060

**Attorneys for Plaintiff**
*California Sportfishing Protection Alliance*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>WEST CONTRA COSTA SANITARY LANDFILL, INC.; WEST COUNTY LANDFILL, INC et al,<br><br>Defendants. | Case No.: 3:25-cv-08203-TSH<br><br>~~**[PROPOSED]**~~ **CONSENT DECREE**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.;* Resource Conservation and Recovery Act, 42 U.S.C. § 6972 *et seq*.)**<br><br>Hon. Magistrate Thomas S. Hixson |

WHEREAS, Plaintiff California Sportfishing Protection Alliance (hereinafter "Plaintiff" or "CSPA") is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of California's waters, including San Pablo Creek, San Pablo Bay, and San Francisco Bay;

WHEREAS, Defendants West Contra Costa Sanitary Landfill, Inc. and West County Landfill, Inc. ("Defendants") own and/or operate an approximately 340-acre complex in Richmond, California consisting of a closed Class I Landfill; a closed Hazard Waste Management Facility; a Corrective Action Management Unit ("CAMU"); a Leachate Treatment Plant; a closed Class II Municipal Solid Waste Landfill; a solid waste transfer station; an organic materials composting facility; and a Construction and Demolition ("C&D") processing operation (hereinafter "the Facility");

WHEREAS, Defendants' industrial activities at the Facility include, but are not limited to, the management of an extensive network of leachate extraction wells (intended to create a permanent inward hydraulic gradient at the Facility), a solid waste transfer station, a composting facility, and a C&D processing area;

WHEREAS, the closed Class II landfill portions of the Facility collect and discharge stormwater into onsite runoff control ponds, San Pablo Bay and San Pablo Creek;

WHEREAS, site maps of the Facility are attached hereto as **Exhibit A** and incorporated herein by reference;

WHEREAS, CSPA and Defendants shall be referred to collectively as the "Parties;"

WHEREAS, stormwater discharges associated with industrial activity are regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES"), General Permit No. CAS000001, State Water Resources Control Board ("State Board") Water Quality Order No. 14-57-DWQ, issued pursuant to Section 402(p) of the Clean Water Act ("CWA"), 33 U.S.C. §1342(p), (hereinafter "General Permit");

WHEREAS, the Resource Conservation and Recovery Act ("RCRA") prohibits "the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste" in a manner "which may present an imminent and substantial endangerment to health or the environment"

(42 U.S.C. § 6972(a)(1)(B));

WHEREAS, on or about May 2, 2025, Plaintiff provided notice of Defendants' alleged violations of the CWA and RCRA ("Notice Letter"), and of its intention to file suit against Defendants to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the United States Attorney General; the Director of the California Department of Resources, Recycling, and Recovery; the Executive Director of the State Board; the Executive Officer of the San Francisco Bay Regional Water Quality Control Board ("Regional Board"); and to Defendants, as required by the CWA (33 U.S.C. § 1365(b)(1)(A) and RCRA (42 U.S.C. § 6972(c));

WHEREAS, on or about September 26, 2025, CSPA filed a complaint against Defendants in the United States District Court, Northern District of California (hereinafter "the Action");

WHEREAS, a true and correct copy of the Notice Letter is attached hereto as **Exhibit B** and incorporated herein by reference;

WHEREAS, Defendants filed their Answer to the Complaint on January 15, 2026 and deny the allegations of the Complaint and occurrence of the violations alleged in the Notice Letter and maintain that they have complied at all times with the provisions of the General Permit, the CWA, and RCRA;

WHEREAS, the Parties agree that it is in their mutual interest to resolve this matter as to all entities and persons named in the Notice Letter without litigation and enter into this Consent Decree ("Decree");

WHEREAS, the Parties agree that by entering into this Decree Defendants do not make any admission of liability regarding the claims made by Plaintiff in the Action, and compliance with this Decree shall not be deemed to be compliance with the General Permit, the CWA, or RCRA;

WHEREAS, within five (5) calendar days of mutual execution, this Decree shall be submitted to the United States Department of Justice ("DOJ") for the 45-day statutory review period, pursuant to 33 U.S.C. § 1365(c) and 42 U.S.C. § 6928(f);

WHEREAS, at the time the Decree is submitted to the DOJ, Plaintiff shall file a Notice of Settlement to notify the Court of the expected date of the expiration of the agencies' statutory review period identified above;

WHEREAS, within ten (10) calendar days of expiration of the statutory review period, or the earlier receipt of non-objection from the DOJ, Plaintiff shall file with the Court (1) a Notice of Completed Agency Review (2) dismissals with prejudice as to Defendants Republic Services, Inc., Ken Lewis, Brent Beveridge and Ben Wade, and (3) and Request for Entry of [Proposed] Consent Decree;

AND WHEREAS, the date of entry of this Decree shall be referred to herein as the "Court Entry Date."

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE PARTIES, AND ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

For the purposes of this Decree, the Parties stipulate that:

(a) the Court has jurisdiction over the subject matter of this action pursuant to 33 U.S.C. § 1365(a)(1)(A) and 42 U.S.C. § 6972(a)(1)(A);

(b) venue is appropriate in the United States District Court for the Northern District of California pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the Facility at which the alleged violations took place is located within this judicial district;

(c) the Complaint states claims upon which relief may be granted against Defendants pursuant to Section 505 of the Clean Water Act, 33 U.S.C. § 1365, and RCRA, 42 U.S.C. § 6972;

(d) Plaintiff has standing to bring this action; and,

(e) the Court shall retain jurisdiction over this matter for purposes of interpreting, modifying, or enforcing the terms of this Decree for the term of the Decree, or as long thereafter as is necessary for the Court to resolve any ongoing disputes or motions to enforce this Decree.

## I. COMMITMENTS OF DEFENDANTS

### A. Compliance with General Permit and RCRA

**1.** Throughout the term of this Decree, Defendants shall implement the measures set forth in this Decree to operate the Facility in compliance with the requirements of the General Permit and RCRA.

**B. Implementation of Specific Stormwater Best Management Practices.**

**2.** Defendants shall complete the implementation and incorporation into the Facility's Storm Water Pollution Prevention Plan ("SWPPP") of the following stormwater source control measures and Best Management Practices ("BMPs") at the Facility:

**3. Establishment of Native Cover Vegetation on Landfill.** As soon as practicable, considering the growing season and establishment requirements of native vegetation, within 30 days of entry of the Decree, Defendant West Contra Costa Sanitary Landfill, Inc. shall commence to reseed its landfill cover with native species vegetation. Native species should be selected based on the San Francisco Bay Area regional climate of the Facility to maximize nutrient (i.e., nitrogen) uptake and provide effective erosion control, without compromising the integrity of the final cover system.

**4. Native Vegetation Maintenance Plan.** No later than thirty (30) days after entry of this Decree, Defendants shall submit a draft plan that includes the BMPs the Facility will employ to establish and maintain the native vegetation on the landfill cover ("Native Vegetation Maintenance Plan") to CSPA. The draft Native Vegetation Maintenance Plan shall include a reseeding plan and specific measures to ensure that the native plant cover maximizes nitrogen uptake, including but not limited to measures to identify areas for remediation, including areas of insufficient or patchy vegetation, and implementation of reseeding at regular intervals, with reseeding occurring at least annually prior to the wet season. Each measure shall have a specific implementation schedule attached to it. CSPA shall have fifteen (15) days to provide comments or questions to Defendants regarding the draft Native Vegetation Maintenance Plan. Defendants shall consider all of CSPA's comments and questions, including specifically consideration of any modifications CSPA recommends. Within fifteen (15) days of receipt of CSPA's comments, Defendants shall finalize the Native Vegetation Maintenance Plan, by adding CSPA's requested recommendations or providing an explanation why the recommendations were not added, and shall also provide a written response to any questions posed by CSPA about the plan. The Native Vegetation Maintenance Plan shall become a requirement of this Decree once finalized, and Defendants shall update the SWPPP to incorporate the Native Vegetation Maintenance Plan in accordance with Paragraph 14 below.

**5. Replacement and Maintenance of Filtrexx EnviroSoxx Industrial Blend.** On or before September 15 of each year during the term of the Decree following entry, Defendants shall replace or install Filtrexx EnviroSoxx Industrial Blend wattles or equivalent wattles and/or media materials at the following locations: WCL-8, WCL-11A, WCL11C, WCL-11D, WCL-11E, WCL-11F, WCL-11G, and WCL-11J. The wattles shall be placed around the drain inlet, as well as horizontal across the stormwater drainage chute, if applicable. Defendants shall ensure that the wattles at each location are in good operating order at all times during the wet season. During each Wet Season (October 1 – May 30), as necessary, Defendants shall replace the wattles when degraded or ineffective, including when there are rips, tears or other visual damage.

**6.** Within twenty-four (24) hours prior to a Forecasted Rain Event, Defendants shall inspect all wattles deployed at the Facility. As used herein, a "Forecasted Rain Event" means a rain event with a probability greater than 30% of precipitation over the next 24 hours, during the Wet Season, based on the national weather service website (www.weather.gov/forecastmaps/) for Richmond, California. See **Exhibit D** for example of weather service forecast report.

**7. Mandatory Minimum Best Management Practices.** As of the Court Entry Date, Defendants shall implement all mandatory minimum BMPs set forth in Section X.H of the General Permit, including but not limited to, additional BMPs to prevent the spreading of trash, green waste, compost, debris, tracked materials, leaked materials, or any other materials on the slopes or surfaces of the Facility; minimize or prevent the tracking of pollutants on exposed road surfaces within the Facility; cover all stored industrial material that can be readily mobilized by contact with stormwater (General Permit, Section X.H.1.a.v); contain all "stored non-solid industrial materials or wastes" that can be "transported or dispersed by the wind or contact water" (General Permit, Section X.H.1.d.vi); and minimize erosion by providing effective stabilization for all inactive areas, finished slopes, and other erodible areas of the Facility prior to all Forecasted Rain Events.

**8. Rain Data.** Defendants shall continue to maintain a fully automated rain gauge at the Facility. Data from the gauge shall be stored electronically and accessible to the Storm Water Pollution Prevention Team at all times during the term of this Decree. The rain gauge data shall be made available to Plaintiff within 14 days of a written request. Defendants shall identify rain gauge

data for all sampling events and the rain gauge data for the preceding three days before the sampling event. The Parties may also use publicly available rain data to resolve any disputes arising under this Decree.

**9. Further Stormwater Management.** During the 2028-2029 Wet Season or any subsequent Wet Season during the term of the Decree, if the average of the sampling results of any "11-series" sampling location[1] does not achieve the exceedance levels identified in **Exhibit C**, no later than July 15 of that year, Defendants shall submit to CSPA a plan to reroute the stormwater above the middle access road via a passive berm or equivalent diversion measure into the stormwater conveyance system discharging to lined Pond A, as indicated on **Exhibit D**. The plan submitted shall include preliminary designs, identify required permits and approvals, and include a demonstration there is sufficient capacity in Lined Pond A to hold the additional stormwater capacity, and an implementation schedule for the plan to be implemented as soon as feasible but no later than May 1 of the following year, subject to applicable laws and permit approvals and requirements. CSPA shall have thirty (30) days to provide comments or questions to Defendants regarding the plan. Defendants shall consider all of CSPA's comments and questions, including specifically consideration of any modifications CSPA recommends. Within thirty (30) days of receipt of CSPA's comments, Defendants shall finalize the plan, by adding CSPA's requested recommendations or providing an explanation why the recommendations were not added, and shall also provide a written response to any questions posed by CSPA about the plan. Implementation of this plan shall become a requirement of this Decree once finalized, and Defendants shall update the SWPPP in accordance with Paragraph 14 below.

**10. SWPPP Update.** Defendants shall update the SWPPP, specifically Section 6.1.6 Non-Stormwater Discharges, to acknowledge the potential for leachate seeps on the landfill surface to cause a discharge of non-stormwater and to document past leachate seeps, including but not limited to a seep occurring on or before August 2, 2017 referred to as LS-1; two seeps occurring on or before November 2019 on the south and north slopes; and seeps occurring on or around July 6, 2023, July 7,

---

[1] 11-series sampling locations includes WCL-11A, WCL-11C, WCL-11D, WCL-11E, WCL-11J, WCL-11F, and WCL-11G.

2023, October 5, 2023, and August 2024. Defendants shall incorporate in the Facility SWPPP, specifically Section 8.1, procedures and controls designed to identify if the seep is stormwater versus leachate and immediately thereafter implement measures to control and eliminate a seep if assessed to be leachate on the surface of the landfill. These procedures and controls shall include, at a minimum, weekly visual monitoring of the Facility consistent with the Post Closure Maintenance Plan, which shall note the date, time and person undertaking the inspection in inspection logs maintained by the Facility and response procedures to be used in the event of any seep.

**11. Notice to CSPA of a Leachate Seep.** In the event that Defendants become aware of any leachate seep on the surface of the landfill at the Facility during the Term of this Decree, Defendants shall notify CSPA in writing through the Notice provisions of this Decree, a soon as practicable and within ten (10) days of Defendants' becoming aware of the seepage event. The notice shall document the details of the seepage, including when it was identified, when it stopped (if flow observed), whether a rain event occurred during or after the event, and what measures Defendants took to ensure the leachate seep did not contribute pollutants to stormwater discharges.

**12. Increased Employee Certification and Training.** Within 30 days of entry of the Decree, Defendants shall modify the Facility SWPPP to require increased training for its Storm Water Pollution Prevention Team ("SWPPT"), including holding two training sessions each Wet Season year for the entire SWPPT and any other employees responsible for implementing the SWPPP, with one held in approximately September and one held in approximately January of each year for the term of this Decree. Defendants shall target this training on understanding the General Permit and current SWPPP, including any recent revisions thereto; understanding the General Permit's prohibition against unauthorized non-stormwater discharges; tracking Forecasted Rain Events, and identifying which of these events qualify for sampling purposes; undertaking visual monitoring; and logging and properly reporting data in the Facility's SWPPP, Annual Report and the State's on-line reporting system ("SMARTS"). Defendants shall log all training sessions and other SWPPT meetings with the date, materials covered, written agenda, and a list of attendees for each, and shall retain these logs with the SWPPP. At all times during the term of this Decree, Defendants shall have at least one member of the

SWPPT that works full time during normal operating hours at the Facility, that is formally certified as a Qualified Industrial Stormwater Practitioner ("QISP").

**C. SWPPP Amendments, Enhanced Monitoring and Action Memoranda**

**13. Initial SWPPP Amendment.** Within 30 days of the Court Entry Date, Defendants shall amend and submit to CSPA the Facility SWPPP to incorporate the specified requirements of this Decree and compliance with the General Permit. These revisions shall reflect all then-current site conditions and practices and identify potential Contaminants of Concern ("COC"), identify the location of all pervious and impervious areas, drop inlets, BMPs, and stormwater flow directions. These revisions shall also provide for required data logging; weekly monitoring and maintenance of all Facility collection and discharge points during the Wet Season; and the twice-annual stormwater management training for Facility employees referenced above.

**14. Further SWPPP Amendments.** Within thirty (30) days after any changes in industrial activities or sources of industrial pollutants, changes to Discharge Points, or changes to sections of the SWPPP identified in the SWPPP as requiring a SWPPP revision (including but not limited to, changes in Facility contacts or PPT members, changes or additions of BMPs, or changes in or additions of industrial activities that impact stormwater discharge), Defendants shall revise the then-current SWPPP to reflect such changes and submit the complete, updated SWPPP to CSPA for CSPA's review and comment.

**15. Review of SWPPP.** For any SWPPP updates pursuant to Paragraphs 13 and 14, CSPA shall have thirty (30) days upon receipt of Defendants' complete SWPPP to provide Defendants with comments. Within thirty (30) days of receiving CSPA's comments and proposed changes to the SWPPP, Defendants shall consider each of the comments and proposed changes and either accept them or provide a brief explanation in writing sufficient to explain why a change is not incorporated. The Parties agree to work in good faith to resolve any disputes with respect to the SWPPP, and any remaining disputes will be resolved through timely initiation of the dispute resolution procedures in Section IV below. Following its incorporation of proposed modification or additions (if any) into each revised SWPPP, Defendant shall upload the revised SWPPP to SMARTS.

**16. Industrial Stormwater Sampling Frequency during the Term of this Decree.** During the term of this Decree, Defendants shall collect and analyze samples at the Facility from four (4) Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and from four (4) QSEs within the second half of each reporting year (January 1 to June 30). If four (4) QSEs do not occur in either half of the Reporting Year, Defendants must sample all QSEs as defined by the General Permit that do occur. The stormwater sample results shall be compared with the values set forth in **Exhibit C**, attached hereto, and incorporated herein by reference. If the results of any such samples exceed the parameter values set forth in Exhibit C, Defendants shall comply with the "Action Memorandum" requirements set forth below.

**17. Required Sampling Parameters.** All samples in each reporting year shall be analyzed for each of the constituents listed in **Exhibit C**, including TMDLs, as applicable, by a laboratory accredited by the State of California. All samples collected from the Facility shall be delivered to the laboratory as soon as possible to ensure that sample "hold time" is not exceeded. Analytical methods used by the laboratory shall comply with General Permit requirements in regard to both test method and detection limit. *See* General Permit, Table 2, at 48. Sampling results shall be provided to CSPA within ten (10) days of Defendants' receipt of the final verified laboratory report from each sampling event, pursuant to the Notice provisions below.

**18. Action Memorandum.** If any sample taken during the term of this Decree exceeds the Evaluation Levels set forth in **Exhibit C** ("Exceedance") or if Defendants are unable to obtain the requisite number of QSE samples or fail to sample in accordance with Paragraph 16, Defendants shall prepare a written statement discussing the Exceedance(s) and/or failure or inability to collect and analyze samples from QSEs, the possible cause and/or source of the Exceedance(s), and additional measures that will be taken to address and eliminate or reduce potential future Exceedances and/or failure or inability to collect required samples ("Action Memorandum"). The Action Memorandum shall be provided to CSPA not later than July 15 following the conclusion of each reporting year. Such additional measures, to the extent feasible, shall be implemented as soon as possible and in no event later than ninety (90) days unless additional time is reasonably required after the due date of the Action Memorandum. For any Action Memoranda prepared pursuant to this Paragraph, CSPA shall

have thirty (30) days upon receipt of Defendants' complete Action Memorandum to provide Defendants with comments. Within thirty (30) days of receiving CSPA's comments and proposed changes to the Action Memorandum, Defendants shall consider each of the comments and proposed changes and either accept them or provide a short written explanation where a change is not incorporated. The Parties agree to work in good faith to resolve any disputes with respect to the Action Memorandum, and any remaining disputes will be resolved through timely initiation of the dispute resolution procedures in Paragraph 45 below. Defendants shall update their SWPPP, in accordance with Paragraph 14, thirty (30) days after the Action Memorandum is final.

**D. Implementation of Specific Infrastructural Improvements and Waste Management Practices to Address Compliance With RCRA.**

**19.** By the terms of this Decree, Defendants shall be required to establish a permanent and stable inward hydraulic gradient over the entire perimeter of the Facility by implementing the following structural improvements to increase leachate extraction rates and locations and by conducting enhanced monitoring practices to better understand the hydraulic gradient at all locations along the perimeter of the Facility.

**20. Improved Monitoring: Installation of Transducers in Four (4) Well Pairs.** By December 15, 2026, Defendants shall install transducers in the inboard and outboard monitoring wells in the following four well pairs:

- Class II #11 (North Side) [M-51 / QR-2]
- Class II #3 (South side) [M-66 / QR-7S]
- Class II #2 (West side) [M-63 / QR-27]
- Class II #7 (HWMF #17) (East Side / E-22R) [E-34R / EW-10P]

These wells are shown on **Exhibit E-1**. These transducers shall be capable of providing high resolution data to assess the extent to which tidal fluctuations or intermittent pumping impacts gradient control (ten minute interval water level data will be collected for the well pairs with sufficient information to convert the pressure data to a fluid elevation). The raw format (or Excel-formatted) data shall be shared with Plaintiff upon request.

**21. Improved Leachate Extraction: Conversion of Eleven Single-Phase (Gas Extraction Only) Wells to Dual-Phase Wells (Liquid and Gas Extraction).** By December 15, 2026, Defendants shall convert the eleven (11) existing single-phase vertical gas extraction wells identified in green on **Exhibit F** to dual-phase wells, allowing these wells to add capacity to the Facility's existing leachate removal system. These wells are: 828A, 819, 818, 843, 032A, 826, 40AD, 817, 519, 841, and 842.

**22. Improved Leachate Extraction: Enhanced Pumping Capacity at Six (6) Existing Wells**. By December 15, 2026, Defendants shall optimize the pumping capacity of the six (6) dual phase vertical gas extraction wells identified below, as follows. On a monthly basis, Defendants shall: review each of the six (6) well's cycle counters; inspect pump connections (including air lines, exhaust lines, discharge lines); inspect for operation to establish that pumps are cycling properly; inspect to establish that cycle counter is functioning properly; inspect clamps and bolts on wells and components to make sure securely tightened; and inspect to look for signs of leaks at all connection points on the above-ground components. These wells are identified in dark blue on **Exhibit F** hereto and listed below: 832, 833, 840, 031A, 030A, and 029A.

**23. Improved Monitoring: Monthly Monitoring of a Portion of the Existing Gas Well Network to Measure Leachate Levels (expressed as the USGS elevation of the well head).** By December 15, 2026, Defendants shall include certain wells in the existing gas well network to monitor leachate levels in the landfill on a monthly basis. These wells are identified on **Exhibit G** hereto. All such monthly monitoring shall be expressed as the USGS elevation[2] of the well head, and shall be logged, with all such logs produced to CSPA on a quarterly basis.

**24. Improved Leachate Extraction: Installation of Six (6) New Perimeter Extraction Wells.** By February 28, 2027, Defendants shall install six (6) new leachate extraction wells along the perimeter of the Class II landfill north of the Hazard Waste Management Facility at the locations identified by yellow circles on **Exhibit E-3**. For each of these six new wells installed, well performance data will be evaluated and calibrated for six months immediately after the well is

[2] Using the North American Vertical Datum 1988.

activated ("Calibration Period"). If any well pair data show two or more monitoring events indicating an outward gradient for two consecutive calendar months at any Compliance Monitoring Point ("CMP"), Defendants will first rehabilitate or enhance the CMP well or nearby pumping well(s) to improve performance ("Rehabilitation Period"). The Rehabilitation Period will last 90 days. In the event the well cannot be rehabilitated to improve performance, the well will be replaced within sixty (60) days at a location close to the existing well pair location along the perimeter of the Class II landfill north of the Hazardous Waste Management Facility.

**25. Improved Leachate Extraction: Installation of Up to 6 Additional Perimeter Extraction Wells.** After December 15, 2027, and before December 1, 2028, Defendants shall install additional leachate extraction wells, up to a maximum of six (6) additional new wells if two or more outward gradient occurrences are determined for a CMP in a calendar month for two consecutive months. In each such instance, Defendants shall notify CSPA (including the identification of the CMP) within ten (10) business days of the end of the two-month period concerned. The new leachate extraction well location shall be agreed upon by the Parties after reviewing all well performance data and meeting and conferring pursuant to the Dispute Resolution Procedures herein. This requirement shall only apply once to any such CMP. All new leachate extraction wells shall be installed within ninety days of the parties' agreement on the well location, unless infeasible due to weather conditions but, in any case, within 180 days. The obligations of this Paragraph shall not be triggered at any CMP where a new leachate extraction well that is intended to address the outward hydraulic gradient at that CMP is within the Calibration Period, as defined in Paragraph 24. For purposes of the monthly measurements of CMPs, during any period where a well or wells are not able to operate as result of a regulatory compliance requirement necessitating temporarily taking the wells off the extraction network, any observed circumstance of an outward gradient associated with the well(s) being taken offline shall not be counted towards a determination of whether an outward gradient has occurred at a CMP twice in a month for two consecutive months. Defendant WCCSL shall notify Plaintiff CSPA within 3 business days in the event a regulatory requirement necessitates taking wells offline from the extraction system, providing CSPA with the regulatory requirement and the estimated duration of time during which the well in question will be off the extraction network (which shall not exceed thirty

days). As used in this paragraph 25, "regulatory compliance activity" means (1) a facility permit requirement or statutory or regulatory provision that requires a temporary shutdown to well pumping in order to undertake a regulatory compliance activity required by law including without limitation 22 CCR 22625.192(k), (2) the repair or replacement of force main sections, (3) the repair or replacement of electrical power infrastructure providing electrical power to the well field, (4) any event of Force Majeure.

**26. Improved Leachate Extraction: Installation of New Pump at Well QR-23S.** By December 1, 2026, Defendants shall install a new pump in the leachate sump identified as QR-23S on the map attached hereto as **Exhibit E-2.**

**27. Improved Leachate Extraction: Facility-Wide Pump Inspection and Maintenance Program.** By December 1, 2026, Defendants shall develop and implement a written pump Inspection & Maintenance Plan ("I&M Plan"). The I&M Plan shall require that each active pump in the Class II extraction network (with the exception of wells QR-46, QR-47, QR-48, QR-15S, and QR-16) be subject to a logged inspection before December 15, 2026, which shall include: (a) measuring the total depth at each active extraction location relative to the top of casing ("TOC"); (b) recording the current pump set depth relative to TOC; (c) cleaning or replacing pumps, piping, or other infrastructure as necessary; (d) installing all pumps to the optimum depth; and (e) detailed logging of all inspections, measurements, recordations, cleanings, or equipment replacement required under this paragraph. All such logs shall be produced to CSPA upon request. Wells to be included in the inspection and maintenance program are shown in blue and white points on **Exhibit E**.

**28. Improved Leachate Extraction: Replacement of Perimeter Extraction Wells QR-15S and QR-16.** On or before February 28, 2027, Defendants shall install new extraction wells near the current locations of the wells designated as QR-15S and QR-16 as shown on **Exhibit H** and shall revert the existing QR-15S and QR-16 wells to monitoring points and include them in the Compliance Monitoring Point well pairs for this Decree as discussed further below.

**29. Improved Leachate Extraction: Improvements to Landfill Gas Dewatering System.** On or before December 1, 2026, Defendants shall complete the design phase for an expansion of the Facility's existing landfill gas ("LFG") dewatering system to allow for the conversion of

existing vertical LFG extraction wells to dual (i.e., gas and liquid) extraction wells. The expanded dewatering system, the construction of which shall be completed by July 1, 2027, subject to permits and agency approvals, will include a piping layout to convey liquids from the dual extraction wells and compressed air supply lines to operate the associated pneumatic dewatering pumps. The selected LFG vertical wells for dewatering will be based on several factors, including but not limited to depth of perched liquid, length of well casing and perforation, current well casing integrity, and well location. The design will also include an assessment of the existing air compressor capacity and the need for additional capacity, if required. Attached hereto as **Exhibit I** are the preliminary drawings for the system expansion.

**30. Improved Leachate Removal Capacity: Upgrades to Leachate Force Main.** On or before July 1, 2027, Defendants shall complete all permit applications for the modification of the existing leachate force main system detailed in **Exhibit J** attached hereto. These force main improvements will be designed to accommodate increased flow associated with ongoing and future landfill liquid removal activities and, subject to permitting requirements and timing of final agency approvals, shall be completed by November 1, 2027. The proposed force main enhancements are intended to improve existing conveyance capacity, maintain regulatory compliance, and ensure reliable long-term performance under variable hydraulic conditions. The design enhancements will evaluate existing landfill liquid removal infrastructure, projected removal rates, and system constraints to identify necessary upgrades to optimize pump station performance and incorporate redundancy to minimize downtime. Special design consideration will be given to maintaining uninterrupted service during construction, integrating the existing controls into the expanded system, and providing flexibility for future expansion.

### E. Compliance Monitoring Protocols to Ensure A Permanent and Stable Inward Hydraulic Gradient at the Entire Facility Perimeter

**31. Well Pairs to Be Used As Compliance Monitoring Points ("CMPs") to Determine Hydraulic Gradient Status Under This Agreement.** The specific well pairs to be used as compliance monitoring points ("CMPs") to determine the hydraulic gradient status of the entire Facility are identified on **Exhibit K**. On or before December 1, 2026, Defendants shall install two

additional well pairs to ensure that the CMPs provide an accurate representation of groundwater flow conditions at the perimeter of the Facility. Specifically, these wells will be installed between pumping locations to determine if the radius of influence from the pumping wells is capturing leachate migration along the complete perimeter of the Class I and Class II landfills. The two additional well pairs shall be installed between existing compliance Points 9 and 10 (M-59 and QR-46) and Points 10 and 11 (PZ-47 and PZ 48). These are designated on **Exhibit K** as well pairs #9A and #10A, respectively.

**32. Frequency of Compliance Monitoring Data Collection and Sharing.** Upon the entry of this Decree, and for the entire term of the Decree, each CMP well pair shall be monitored on a weekly basis, at the same tidal status, and within thirty (30) minutes of the other well in the pair based on field conditions and weather access. In the event that the high resolution pressure transducer data discussed herein indicates that the tidal influence at any compliance well pair warrants a reduction of this 30-minute limit to ensure the integrity of the monitoring, the Parties shall promptly meet and confer in good faith to resolve the issue pursuant to the Dispute Resolution provisions herein. All such weekly compliance well monitoring data shall be compiled and shared with CSPA on a twice-monthly basis. In addition, Defendants shall share all of the weekly SCADA extraction well status information, on a twice-monthly basis, subject to the Non-Disclosure Agreement executed on August 27, 2026.

**33.** If Defendants have not demonstrated they have achieved an inward hydraulic gradient at all compliance monitoring points based on the monthly measurements and process as set forth in paragraphs 24 and 25 above, Defendants shall produce an action memorandum by December 15 of every year during the Term starting December 15, 2028. For purposes of the action memorandum, Defendants will have not achieved an inward hydraulic gradient if the Facility's monitoring has indicated an uncorrected outward hydraulic gradient from January 1 to December 1 of that year and the CMP has not returned to gradient compliance by following the procedures set forth in paragraphs 24 and 25 above. The action memorandum shall identify the areas and frequency of the outward hydraulic gradient and propose additional measures Defendants will implement, which are sufficient to achieve an inward hydraulic gradient at all compliance monitoring points. The action memorandum

shall include an implementation plan that implements the proposed additional measures as soon as technically possible.

**34.** For any action memorandum prepared pursuant to Paragraph 33, CSPA shall have thirty (30) days upon receipt of Defendants' complete action memorandum to provide Defendants with comments. Within thirty (30) days of receiving CSPA's comments and proposed changes to the action memorandum, Defendants shall consider each of the comments and proposed changes and either accept them or provide a short written explanation where a change is not incorporated. The Parties agree to work in good faith to resolve any disputes with respect to the action memorandum, and any remaining disputes will be resolved through timely initiation of the dispute resolution procedures in Paragraph 41 below.

**35.** If Defendants have not demonstrated they have achieved an inward hydraulic gradient at all of the Facility's CMPs by having no outward hydraulic gradients measured at any of the CMPs for one consecutive 12 month period, CSPA shall have the right to terminate the Decree as to CSPA's RCRA claim at any point after January 1, 2029 upon thirty (30) days' notice. The provisions of this Decree that will be terminated pursuant this Paragraph are Paragraphs 19-34 and the waiver and release, as stated in Paragraph 44, as related to RCRA shall be null. All other provisions of this Decree shall remain in effect.

**F. Inspections and Information Sharing**

**36. Inspections During the Term of This Decree.** Defendants shall permit representatives of CSPA to perform up to three (3) physical inspections of the Facility if reasonably needed during the term of this Decree. These inspections shall be performed by CSPA's counsel and consultants and may include sampling, photographing, and/or videotaping, and CSPA shall provide Defendants with a copy of all sampling reports, photographs, and/or video. CSPA shall provide at least seventy-two (72) hours advance notice of such physical inspection. Defendants shall not make any alterations to Facility conditions during the period between receiving CSPA's initial seventy-two (72) hour advance notice and the start of CSPA's inspection that Defendants would not otherwise have made but for receiving notice of CSPA's request to conduct a physical inspection of the Facility. Nothing herein shall be construed to prevent Defendants from any required maintenance and/or

continuing to implement any BMPs identified in the SWPPP during the period prior to an inspection by CSPA or at any time.

**37. Communications To/From Regional and State Water Boards**. During the term of this Decree, Defendants shall provide CSPA with courtesy copies of all documents submitted or uploaded to, or received from or sent to, the Regional Board; the State Board; the California Department of Resources, Recycling and Recovery; and EPA Region IX concerning stormwater or groundwater discharges from the Facility, including, but not limited to, all documents and reports submitted or uploaded to the Regional Board and/or State Board as required by the current General Permit and WDR. This requirement shall include the semi-annual submittal of hydraulic gradient data provided to the Regional Board pursuant to the facility WDRs. Such documents and reports shall be provided to CSPA via email pursuant to the Notice provisions set forth below contemporaneously with Defendants' submission(s) or uploads(s) to, or, receipt from, such agencies.

**G. Mitigation, Compliance Monitoring, Fees and Costs.**

**38. CWA Environmental Benefit Projects.** As mitigation to address any alleged potential harms from the CWA violations alleged in the Action, Defendants agree to pay the sum of $135,000 to 7th Generation Advisors for projects to improve water quality in, or the ecosystems of or bordering, the watersheds of San Pablo Creek, San Pablo Bay, and the San Francisco Bay. Such mitigation payment shall be remitted directly to 7th Generation Advisors, 1223 Wilshire Blvd. #776, Santa Monica, CA 90403 within ten (10) days after the Court Entry Date.

**39. RCRA Environmental Benefit Projects.** As mitigation to address any alleged potential harms from the RCRA violations alleged in the Action, Defendants agree to pay the sum of $385,000 to the Rose Foundation for projects to improve aquatic and ecological resources, prevent pollution, or reduce hazardous waste generation or disposal in, or the ecosystems of or bordering, the watersheds of San Pablo Creek, San Pablo Bay, and the San Francisco Bay, or pollution-impacted communities in these watersheds. Such mitigation payment shall be remitted directly to Rose Foundation at: 201 4th Street, Suite 102, Oakland, CA 94607-4369 within ten (10) days after the Court Entry Date.

**40. Compliance Monitoring Funding**. To defray CSPA's reasonable investigative, expert, consultant, and attorneys' fees and costs associated with monitoring Defendants' compliance with this Decree, Defendants agree to pay the sum of $35,000 per year to a compliance monitoring fund maintained by counsel for CSPA as described below. Payment for the first year of the Decree shall be made payable to the "Law Offices of Andrew L. Packard Attorney Client Trust Account" and remitted to Plaintiff's counsel at the Notice address provided herein within ten (10) days after the Court Entry Date. Payment for the second through fourth years of the Decree shall be due within ten (10) days of the anniversary of the Decree's entry date. Compliance monitoring activities may include, but shall not be limited to, site inspections, review of well monitoring and water quality sampling reports, review and response to Annual Reports, discussions with Defendants concerning the ERA reports referenced above, potential changes to compliance requirements herein, and any other aspect of monitoring Defendant's compliance with this Decree.

**41. Reimbursement of Plaintiff's Fees & Costs.** Defendants agree to reimburse CSPA in the amount of $540,000 to defray CSPA' reasonable investigative, expert, consultant, and attorneys' fees and costs, and all other costs incurred as a result of investigating the activities at the Facility, bringing the action, and negotiating a resolution of this action in the public interest. Payment shall be made payable to the "Law Offices of Andrew L. Packard Attorney-Client Trust Account" and remitted to Plaintiff's counsel at the Notice address provided herein within ten days after the Court Entry Date.

## II. DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT DECREE

**42.** If a dispute under this Decree arises, or either Party believes that a breach of this Decree has occurred, the Parties shall meet and confer within seven (7) days (or such other period on which the Parties may agree) of receiving written notification from the other Party of a request for a meeting to determine whether a breach has occurred and to develop a mutually agreed upon plan, including implementation dates, to resolve the dispute. If the Parties fail to meet and confer, or the meet-and-confer does not resolve the issue, after at least seven (7) days have passed after the meet-and-confer occurred or should have occurred, either Party shall be entitled to all rights and remedies under the law, including filing a motion in the District Court of California, Northern District, which shall retain jurisdiction over the Action until the Termination Date for the limited purposes of

enforcement of the terms of this Decree. Any such motion may be filed for hearing before the Honorable Magistrate Judge Laurel Beeler, if her schedule allows for a reasonably prompt hearing. The Parties shall be entitled to seek fees and costs incurred in any such motion or related work, and such fees and costs shall be awarded to either party, pursuant to the provisions set forth in the then-applicable CWA, RCRA, Rule 11 of the Federal Rules of Civil Procedure, and applicable case law interpreting such provisions.

**43. Force Majeure**. Performance of the provisions of this Decree shall be extended or excused due to events of Force Majeure and any unforeseeable causes beyond the reasonable control of either Party and without the fault or negligence of the Party asserting Force Majeure, including, without limitation acts of God or of the public enemy, severe weather, fires, earthquakes, floods, pandemics, quarantine restrictions, labor disruptions and strikes, government emergency orders, riots, freight embargoes, wars, and/or acts of any governmental agency. A Force Majeure event shall not include a Party's economic hardship, inability to pay, or employee negligence. Any Party seeking to rely upon this Paragraph to excuse or postpone performance shall have the burden of establishing the Force Majeure event, and that the Force Majeure event prevented or delayed performance notwithstanding that Party's due diligence in attempting to mitigate the effects of the Force Majeure Event. The Parties shall exercise due diligence to resolve and remove the impact of any Force Majeure event.

## III. WAIVERS AND RELEASES

**44. CSPA's Waiver and Release.** Upon the Court Entry Date, CSPA, on its own behalf and on behalf of its subsidiaries, successors, assigns, directors, officers, agents, attorneys, representatives, and employees, releases Defendants and their officers, directors, employees, shareholders, parents, subsidiaries, and affiliates, and each of its predecessors, successors and assigns, and each of their agents, attorneys, consultants, and other representatives from, and waives all claims arising from or pertaining to the Notice Letter, including, without limitation, this action and all claims for injunctive relief, damages, penalties, fines, sanctions, mitigation (including all fees of attorneys, experts, and others, and costs), or any other sum incurred or claimed or which could have been claimed under the Clean Water Act (including claims regarding the General Permit) or RCRA in this

Action, for the alleged failure of WCCSL to comply with the Clean Water Act or RCRA at the Facility, up to the Court Entry Date.

**45. Defendants' Waiver and Release**. Defendants, on its own behalf and on behalf of any Released Defendant Party under its control, releases CSPA (and its officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of their successors and assigns, and its agents, attorneys, and other representative) from, and waives all claims which arise from or pertain to the Action, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed for matters associated with or related to the Action.

## IV. MISCELLANEOUS PROVISIONS

**46. No Admissions**. The Parties enter into this Decree for the purpose of avoiding prolonged and costly litigation of the claims in the Action. Nothing in this Decree shall be construed as, and Defendants expressly do not intend to imply an admission as to any fact, finding, issue of law, or violation of law, nor shall compliance with this Decree constitute or be construed as an admission by Defendants of any fact, finding, conclusion, issue of law, or violation of law. However, this paragraph shall not diminish or otherwise affect the obligation, responsibilities, and duties of the Parties under this Decree.

**47. Termination Date.** This Decree shall be effective upon mutual execution by all Parties and entry by the Court as described above. This Decree shall terminate on the "Termination Date" which shall be four years after the date this Decree is entered by the Court (except for the purposes of enforcing the terms of the Decree). The Parties shall meet and confer in good faith at least 90 days before the Termination Date to determine if any additional measures are warranted or to allow this Decree to expire by its own terms.

**48. Counterparts.** This Decree may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document. An executed copy of this Decree shall be valid as an original.

**49. Severability.** In the event that any one of the provisions of this Decree is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

**50. Construction and Choice of Law.** The language in all parts of this Decree, unless otherwise stated, shall be construed according to its plain and ordinary meaning. This Decree shall be construed pursuant to the law of the United States, without regard to choice of law principles.

**51. Authority.** The undersigned are authorized to execute this Decree on behalf of their respective Parties and have read, understood, and agree to be bound by all of the terms and conditions of this Decree.

**52. Complete Agreement.** All agreements, covenants, representations, and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Decree are contained herein. This Decree and its attachments are made for the sole benefit of the Parties, and no other person or entity shall have any rights or remedies under or by reason of this Decree, unless otherwise expressly provided for therein.

**53. Notices**. Any notices or documents required or provided for by this Decree or related thereto that are to be provided to CSPA pursuant to this Decree shall be sent by electronic mail transmission to the email addresses listed below:

Chris Shutes, Executive Director - E-mail: blancapaloma@msn.com

With copies sent to:

Erica Maharg - E-mail: eam@atalawgroup.com

Andrew L. Packard - E-mail: andrew@packardlawoffices.com

Any notices or documents required or provided for by this Decree or related thereto that are to be provided to Defendants pursuant to this Decree shall be sent by electronic mail transmission to the email addresses listed below:

Mr. Ken Lewis

General Manager, WCCSL

KLewis@republicservices.com

With copies sent to:

Judith George, Esq.

Senior Corporate Counsel

jgeorge4@republicservices.com

With copies sent to:

Scott W. Gordon, Esq. - E-mail: swgordon@tbsglaw.com

Each Party shall promptly notify the other of any change in the above-listed contact information.

**54. Digital Signatures.** Signatures of the Parties transmitted by email shall be deemed binding.

**55. Joint and Several Liability.** Defendants shall be jointly and severally liable for all obligations in the Decree.

**56.** If for any reason the Court should decline to approve this Decree in the form presented, the Parties shall use their best efforts to work together to modify the Decree within thirty (30) days so that it is acceptable to the Court. If the Parties are unable to modify this Decree in a mutually acceptable manner within thirty (30) days, this Decree shall become null and void.

**57.** This Decree shall be deemed to have been drafted equally by the Parties and shall not be interpreted for or against any Settling Party on the ground that any such party drafted it.

**58.** This Decree and the attachments contain all of the terms and conditions agreed upon by the Parties relating to the matters covered by the Decree, and supersede any and all prior and contemporaneous agreements, negotiations, correspondence, understandings, and communications of the Parties, whether oral or written, respecting the matters covered by this Decree. This Decree may be amended or modified only by a writing signed by the Parties or their authorized representatives.

The Parties hereby enter into this Decree and respectfully submit it to the Court for entry.

Dated: August 31, 2026

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

By: ______________________________

Chris Shutes, Executive Director

Dated: ___________

WEST CONTRA COSTA SANITARY LANDFILL, INC.

By: ______________________________

Yasser Brenes, Vice President

With copies sent to:

Scott W. Gordon, Esq. - E-mail: swgordon@tbsglaw.com

Each Party shall promptly notify the other of any change in the above-listed contact information.

**54. Digital Signatures.** Signatures of the Parties transmitted by email shall be deemed binding.

**55. Joint and Several Liability.** Defendants shall be jointly and severally liable for all obligations in the Decree.

**56.** If for any reason the Court should decline to approve this Decree in the form presented, the Parties shall use their best efforts to work together to modify the Decree within thirty (30) days so that it is acceptable to the Court. If the Parties are unable to modify this Decree in a mutually acceptable manner within thirty (30) days, this Decree shall become null and void.

**57.** This Decree shall be deemed to have been drafted equally by the Parties and shall not be interpreted for or against any Settling Party on the ground that any such party drafted it.

**58.** This Decree and the attachments contain all of the terms and conditions agreed upon by the Parties relating to the matters covered by the Decree, and supersede any and all prior and contemporaneous agreements, negotiations, correspondence, understandings, and communications of the Parties, whether oral or written, respecting the matters covered by this Decree. This Decree may be amended or modified only by a writing signed by the Parties or their authorized representatives.

The Parties hereby enter into this Decree and respectfully submit it to the Court for entry.

Dated: ____________

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

By: ______________________________
Chris Shutes, Executive Director

Dated: 09/01/2026

WEST CONTRA COSTA SANITARY LANDFILL, INC.

Yasser Brenes

By: ______________________________
Yasser Brenes, Vice President

Dated: 09/01/2026

WEST COUNTY LANDFILL, INC.

By: *Yasser Brenes*
Yasser Brenes, Vice President

**APPROVED AS TO FORM:**

Dated: ___________

LAW OFFICES OF ANDREW L. PACKARD

By: ________________________________
Andrew L. Packard
Attorneys for Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

Dated: August 31, 2026

LAW OFFICES OF SCOTT W. GORDON, PC

By: *Scott W. Gordon*
Scott W. Gordon
Attorney for Defendants WEST COUNTY LANDFILL, INC. and WEST CONTRA COSTA SANITARY LANDFILL, INC.

Good cause appearing, **IT IS SO ORDERED**.

Dated: ___________

By: ________________________________
HON. THOMAS S. HIXSON
United States District Court
Northern District of California

Dated: ___________ WEST COUNTY LANDFILL, INC.

By: ________________________________
Yasser Brenes, Vice President

**APPROVED AS TO FORM:**

Dated: September 1, 2026 LAW OFFICES OF ANDREW L. PACKARD

By: ________________________________
Andrew L. Packard
Attorneys for Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

Dated: ___________ LAW OFFICES OF SCOTT W. GORDON, PC

By: ________________________________
Scott W. Gordon
Attorney for Defendants WEST COUNTY LANDFILL, INC. and WEST CONTRA COSTA SANITARY LANDFILL, INC.

Good cause appearing, **IT IS SO ORDERED**.

Dated: October 20, 2026 By: ________________________________
HON. THOMAS S. HIXSON
United States Magistrate Judge
Northern District of California

**EXHIBIT LIST**

EXHIBIT A – Facility Site Map (s)

EXHIBIT B –Notice of Violation and Intent to Sue Letter

EXHIBIT C – Testing Parameters

EXHIBIT D – referenced in Paragraph 9 [plan to re-route storm water]

EXHIBIT E – referenced in Paragraph 20 [4 pairs of new transducers for monitoring]

ALSO referenced in Paragraph 24 [6 NEW EXTRACTION WELLS]

ALSO referenced in Paragraph 26 [new pump at QR-23S]

ALSO referenced in Paragraph 27 [I&M Plan wells]

EXHIBIT F – – referenced in Paragraph 21 [11 gas extraction wells being converted to dual phase]

ALSO referenced in Paragraph 22 [6 dual phase wells being optimized]

EXHIBIT G -- – referenced in Paragraph 23 [monitoring of gas well liquid level]

EXHIBIT H -- referenced in Paragraph 28 [replacement of wells QR-15S and QR-16]

EXHIBIT I – referenced in Paragraph 29 [expansion of the dewatering system]

EXHIBIT J – referenced in Paragraph 30 [leachate force main upgrades]

EXHIBIT K – referenced in Paragraph 31 [identification of all CMPs]

**EXHIBIT A – Facility Site Maps**




Q:\PROJECTS\DB25.1235_WEST_COUNTY_LANDFILL\GIS\ARCGIS_PRO\SITE MAPS\SITE MAPS1.APRX • EXHIBIT A

Geo-Logic ASSOCIATES
8/18/2026 DB25.1236

WEST CONTRA COSTA SANITARY LANDFILL
**Site Map**

Exhibit A

**EXHIBIT B – Notice of Violation and Intent to Sue Letter**

DRAFT

May 1, 2025

**VIA CERTIFIED MAIL**

Ken Lewis, General Manager
West Contra Costa Sanitary Landfill, Inc.
P.O. Box 4100
Richmond, CA 94804

Brent Beveridge
Environmental Compliance Manager
West Contra Costa Sanitary Landfill, Inc.
1 Parr Boulevard
Richmond, CA 94801

Julia Arambula, Chief Executive Officer
West Contra Costa Sanitary Landfill, Inc.
18500 North Allied Way
Phoenix, AZ 85054

Agent for Service of Process for:
West Contra Costa Sanitary Landfill, Inc.
1505 Corporation
C T Corporation System
330 N Brand Boulevard
Glendale, CA 91203

Julia Arambula, Chief Executive Officer
West County Landfill, Inc.
18500 North Allied Way
Phoenix, AZ 85054

Agent for Service of Process for:
West County Landfill, Inc.
1505 Corporation
C T Corporation System
330 N Brand Boulevard
Glendale, CA 91203

John Vander Ark, Chief Executive Officer
Republic Services, Inc.
18500 North Allied Way
Phoenix, AZ 85054

Ben Wade, Area Environmental Manager
Republic Services, Inc.
18500 North Allied Way
Phoenix, AZ 85054

Agent for Service of Process for:
Republic Services, Inc.
1505 Corporation
C T Corporation System
330 N Brand Boulevard
Glendale, CA 91203

**RE: NOTICE OF ENDANGERMENT AND INTENT TO FILE SUIT PURSUANT TO THE RESOURCE CONSERVATION AND RECOVERY ACT, 42 U.S.C. § 6972(a)(1)(B); NOTICE OF VIOLATIONS AND INTENT TO FILE SUIT UNDER THE FEDERAL WATER POLLUTION CONTROL ACT, 33 U.S.C. §§ 1251 *et seq*.**

To Whom It May Concern:

This letter provides notice to West Contra Costa Sanitary Landfill, Inc., West County Landfill, Inc., Republic Services, Inc., Ken Lewis, Brent Beveridge and Ben Wade of ongoing violations of the Resource Conservation and Recovery Act ("RCRA") and Clean Water Act

("CWA") occurring at the landfill complex at 1 Parr Boulevard, in Richmond, California (the "Facility"). This letter is being sent to you as the responsible owners, officers, and/or operators of the Facility or as the registered agent for corporate notice.

Unless otherwise noted, West Contra Costa Sanitary Landfill, Inc., West County Landfill, Inc., Republic Services, Inc., Ken Lewis, Brent Beveridge and Ben Wade shall hereinafter be collectively referred to as "Republic." West County Landfill, Inc., owns the Facility and West Contra Costa Sanitary Landfill, Inc. manages the Facility. Both of these corporate entities – West Contra Costa Sanitary Landfill, Inc. and West County Landfill, Inc. were acquired by Republic Services, Inc. in 2001. California Sportfishing Protection Alliance ("CSPA") intends to file suit pursuant to section 7002(a)(1)(B) of RCRA (42 U.S.C. § 6972(a)(1)(B)) and section 505(a) of the CWA (33 U.S.C. § 1365(a)) regarding the violations detailed in this letter.

CSPA is notifying Republic that its past and present handling, storage, treatment, transportation, and/or disposal of solid waste at the Facility, including leachate from both the closed Class I and Class II former landfill areas discussed below, may have caused and be causing an imminent and substantial endangerment to human health and/or the environment, in violation of RCRA section 7002(a)(1)(B) (42 U.S.C. § 6972(a)(1)(B)). RCRA requires that ninety (90) days prior to initiating a civil action against any alleged violator, a plaintiff must give notice of its intent to file suit to the persons alleged to be in violation, as well as to state and federal agencies. 42 U.S.C. § 6972(b)(2)(A).

Pursuant to Section 3008(g) of RCRA (42 U.S.C. § 6928(g)) and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of RCRA subjects Republic to a penalty for all violations occurring during the period commencing five years prior to the date of this letter. These provisions of law authorize civil penalties of up to $93,058 per day per violation for all violations occurring after November 2, 2015, where penalties are assessed on or after January 8, 2025. In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of RCRA pursuant to 42 U.S.C. §6972(a)(2)) and such other relief as permitted by law.

CSPA is also placing Republic on notice of the fact that it is in ongoing violation of the substantive and procedural requirements of the Clean Water Act, 33 U.S.C. § 1251 *et seq*. Specifically, Republic has violated the CWA by discharging leachate without a permit in violation of CWA § 301(a), 33 U.S.C. § 1311(a). Republic has also violated the CWA by failing to comply with the National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 14-57-DWQ as amended by Order No. 2015-0122-DWQ & Order No. 2018-0028-DWQ (collectively "General Permit" or "Permit").

Pursuant to Section 309(d) of CWA and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects Republic to a penalty for all violations occurring during the period commencing five years prior to the date of this letter. These provisions of law authorize civil penalties of up to $68,445 per day per violation for all violations occurring after November 2, 2015, where penalties are assessed on or after January 8, 2025. In addition to civil penalties, CSPA will seek injunctive relief preventing

further violations of the CWA pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.

This letter (hereinafter "Notice Letter") provides notice to Republic of these violations of RCRA and the CWA occurring at the Facility. Sixty (60) days after the date of this Notice Letter, CSPA intends to file a complaint in federal court alleging violations of the CWA occurring at the Facility, and ninety (90) days after the date of this Notice Letter, CSPA intends to amend the complaint to allege violations of RCRA occurring at the Facility. RCRA and the CWA are strict liability statutes to which few if any defenses may be available.

## I. BACKGROUND

### A. California Sportfishing Protection Alliance

CSPA is a California non-profit corporation dedicated to the preservation, protection and defense of the environment, wildlife, and natural resources of California waters, including the waters into which Republic unlawfully discharges polluted stormwater and/or leachate. For forty years, CSPA has been recognized in California and in the nation as a leading enforcer of state and federal environmental laws protecting water resources.

Members of CSPA enjoy the waters that the Facility discharges into, including San Pablo Bay. Members of CSPA use and enjoy these waters for fishing, for their estuarine habitat and the rare, threatened, and endangered species it supports, and for their wildlife habitat, marine habitat, and other designated beneficial uses. Discharges of pollutants from the Facility impair each of these uses. These discharges of polluted stormwater and leachate from the Facility are ongoing and continuous. Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Republic' failure to comply with RCRA and the CWA.

### B. The Facility

The Facility comprises approximately 340 acres and is directly adjacent to Wildcat Marsh, San Pablo Creek, San Pablo Bay and the San Francisco Bay. The Facility includes a 160-acre closed Class II solid waste landfill, on top of which there is a composting operation, and an adjacent 28-acre closed Class I hazardous waste monitoring facility. The Class II landfill reached capacity in September 2006, was deactivated, and received approval for landfill closure under RCRA when the final cover was completed in 2010. The Class I facility was operated as a waste disposal facility from 1953 to 1985 and included a 9.5-acre surface impoundment and an 11.5-acre landfill. The Class I facility was closed in 2003, and a low permeability cover (or cap) was installed during closure activities through 2007. In addition to the landfill and composting operation, the Facility's ongoing operations include a construction and demolition debris processing area, a waste transfer station, a corrective action management unit, a leachate treatment plant, and a power/cogeneration plant. The current industrial activities at the Facility fall under Standard Industrial Classification ("SIC") 5093 (for "Scrap and Waste Materials (not including source separated recycling)") and 2875 (for "Fertilizers, Pesticides, etc"). The Waste Discharger Identification for the Facility is 2 07I005532.

The Facility's Storm Water Pollution Prevention Plan ("SWPPP") identifies eight drainage areas. A map of the Facility is provided below. Drainage Area 1, the northeast corner of the Facility, ultimately flows into the San Pablo Bay (via San Pablo Creek). The rest of the northern portion of the Facility (Drainage Areas 2-8) flows directly into the San Pablo Bay. Stormwater from the central and southern portions of the site, identified by Republic as Drainage Area 9 and encompassing the composting operations, drains into a retention pond ("Pond A"). If Pond A exceeds its capacity, stormwater then flows into an unlined auxiliary retention pond ("Pond B"). The northern portion of Pond A is lined, and the southern Portion of Pond A is unlined. (In 2022, Pond A was expanded by shifting the prior earthen berm that separated the lined and unlined ponds to the southwest, increasing the lined portion of Pond A"s capacity from approximately 6.9 acre-feet to approximately 13.8 acre-feet.) Pond B was created by constructing berms to separate the Facility from San Francisco Bay and the adjacent tidal marsh. Pond A receives inflows from much of the site, including the Class I landfill, the power/cogeneration plant, and the leachate treatment plant. If Pond A overflows, co-mingled stormwater discharges over a spillway into Pond B. Other stormwater from Drainage Area 9 is separately conveyed to the unlined portion of Pond A.

To reduce leachate from the Facility and minimize groundwater outmigration of pollutants, Republic has constructed low-permeability cutoff walls around the perimeter of the Facility. Specifically, between 1977 and 1996, seepage control barriers (or cutoff walls) were constructed around the Facility's perimeter. The cutoff walls fall into two different categories, depending on when they were installed. The original cutoff wall system installed in the late 1970s was composed entirely of local mud and is referred to as the Bay Mud Barrier. Following recommendations from the San Francisco Bay Regional Water Quality Control Board ("Regional Board"), which regulates the Facility under the Clean Water Act, a system of "slurry" walls was installed in the mid-1980s in a number of key areas around the Facility. These "slurry" walls were intended to augment the Bay Mud Barrier walls.

The Class II landfill has no engineered leachate drainage system installed beneath the landfill because that landfill was filled before such systems were considered necessary. Due to ongoing subsidence, the base of the Facility is now below the groundwater table. As a result, Republic installed a leachate collection and removal system consisting of a system of subsurface drains connected to extraction sumps located adjacent to, but not directly underneath, the Class II landfill. This system was installed between 2007 and 2008. There are eleven (11) extraction sumps throughout the Facility. Leachate from the Class II landfill is transferred to an on-site Leachate Treatment Plant, and treated leachate is stored in a 72,000-gallon storage tank. Treated wastewater is ultimately transferred to the City of Richmond's wastewater treatment facility. This system removes millions of gallons of leachate every year. The goal of this system is to create a negative or "inward hydraulic gradient" whereby leachate and impacted groundwater is drawn into the Facility leachate collection system rather than migrating outward into Wildcat Marsh, San Pablo Creek, San Pablo Bay, and the San Francisco Bay. Nevertheless, and as described more fully below, the Facility has been unable to maintain this negative or inward gradient within the Facility footprint since prior to the approval of closure and continues to discharge pollutants to these waters.

Republic monitors the hydraulic gradient of the leachate using a series of well pairs, situated around the perimeter of both landfill units. Each well pair is comprised of an outward

well, which is situated outside the cutoff wall, and an inward well located inside of the cutoff wall. The hydraulic gradient of the leachate is determined by comparing the hydraulic head in the inward well to the hydraulic head measured in the outward well. If the hydraulic head in the outer well is less than the head in the inward well, this indicates a positive or outward gradient. A positive or outward gradient provides a pathway for leachate to flow from the landfill into surrounding waters. Publicly available operator records have documented a positive/outward gradient at one or more locations along the northeastern and eastern boundaries of the Facility since monitoring began, starting before formal closure in 2010. These observations have routinely included multiple events annually where hydraulic control has not been achieved between monitoring wells M-60 and M-48 along the northeastern portion of the facility and nearly every monitoring event along the eastern boundary of the facility between monitoring wells E-34R and M-70.

Also provided in publicly available operator records is a study completed by a Republic contractor in January 2024.[1] The study was completed in response to an order of the Regional Board (Order No. R2-2022-0011) issued to Republic. Provision 5(a) of this order requires Republic to complete an investigation and evaluation monitoring to define the nature and extent of contaminants present in groundwater beyond the leachate barrier walls. In the corresponding investigation report, the following is noted in Section 5.1, Finding #4:

> *A laterally extensive sandy interval occurs in borings on the eastern side of the investigation area, which becomes less sandy and more silty toward the west. This interval occurs between approximately 31 and 36 ft. bgs, or similar depth. This unit has been affected by contaminants to a lesser degree than shallower groundwater. However, this unit has the potential to transmit contaminants underneath the barrier, depending on the direction of groundwater flow in that unit.*

These observations are consistent with the lithology observed for other facility well logs located both inside and outside of the slurry wall and for area well logs on adjacent properties. The general stratigraphy of the soil column in this area is comprised of a silty clay mixture interspersed with sand and gravel layers. The silt, sand and gravel composition of the soil column facilitates migration of liquid wastes downward and laterally. Given the northeastern and eastern portions of the facility are where an inward gradient has never been fully maintained, a complete pathway for leachate to impact surface and groundwater becomes clear when the following are considered together: a) regularly observed positive / outflow gradient and b) stratigraphy that lends to the migration of leachate beneath the slurry wall, and c) as discussed in more detail below, numerous exceedances of regulatory compliance limits for chemicals of concern in the northeastern and eastern region of the Facility. Combined with recurring seeps forming within the landfill (evidencing a failure to maintain the required hydraulic gradient), these lines of evidence present a compelling case that a migration pathway for contaminants not only exists, but is allowing the ongoing transport of hazardous and toxic chemicals outside the leachate collection system, beyond the slurry wall, and into the Impacted Waters.

---

[1] *Republic Services, Inc., West Contra Costa Landfill – Class II Waste Management Facility, Evaluation of Potential Waste Impacts Beyond the Barrier Walls*, SLR International Corporation, January 15, 2024.

### C. Persons Responsible for the Violations

Based on the information currently available to CSPA, the Facility is owned and operated by West County Landfill, Inc. and West Contra Costa Sanitary Landfill, Inc., respectively. Both entities are active California corporations wholly owned by Republic Services, Inc. Republic Services, Inc. is the second largest provider of waste disposal services in the United States, owning or operating 206 active landfills and having responsibility for closure and post-closure obligations at another 128 closed landfills, including the Facility at issue here. According to the information currently available to CSPA, the General Manager of the Facility is Ken Lewis, the Environmental Compliance Manager of the Facility is Brent Beveridge, and the Area Environmental Manager for Republic Services, Inc. is Ben Wade.

### D. Impacted Waters: Wildcat Marsh, San Pablo Creek, San Pablo Bay, and San Francisco Bay

As outlined below, the stormwater discharges, leachate, and unlawful mismanagement of solid wastes at the Facility reported by Republic and described below cause a variety of pollutants[2] to flow, both above and below the ground surface, to Wildcat Marsh, San Pablo Creek, San Pablo Bay, the San Francisco Bay, and the Pacific Ocean (collectively the "Impacted Waters"). In addition to the Impacted Waters, the Facility is also located above and adjacent to aquifers, such that leaching may ultimately contaminate such aquifers.

### E. Risks to Public Health and the Environment

The Facility discharges and has discharged dangerous volatile and semi-volatile organic chemicals, metals, and cyanide as described below:

- tert-Butyl alcohol ("TBA")
- tetrahydrofuran ("THF")
- 1,4-Dioxane
- methyl-tert-butyl ether ("MTBE")
- PFAS/PFOA compounds[3]
- chlorobenzene ("CB")
- dibenzofuran

---

[2] According to the 2024 Annual Monitoring Report for the Facility, the pollutants that have been detected in the Facility's groundwater by Republic include, but are not limited to, the following carcinogenic and reprotoxic volatile organic compounds (or "VOCs") and metals: tertiary butyl alcohol ("TBA"), tetrahydrofuran ("THF"), 1,4-Dioxane ("Dioxane"), diethyl ether ("DE"), benzene, chlorobenzene ("CB"), methyl tertiary butyl ether ("MTBE"), di-isopropyl ether ("DIPE"), isopropylbenzene, tert-butyl alcohol, naphthalene, 1,4-Dichlorobenzene, 1,2,4-Trimethylbenzene, n-Propylbenzene, carbon disulfide, arsenic, barium, chromium, copper, nickel, and selenium.

[3] A 2020 study completed by Republic found extensive PFAS & PFOA compounds in the landfill leachate and PFAS compounds in monitoring wells outside the slurry wall. In the intervening five years since the study, it appears that no additional steps have been taken to add them to the monitoring program or to investigate them further.

- diethyl ether
- di-isopropyl ether
- isopropylbenzene
- methyl-tert-butyl ether
- naphthalene
- 2-Methylnaphthalene
- 1,1-Dichloroethane
- 1,2-Dichlorobenzene
- 1,4-Dichlorobenzene
- 1,2,4 Trimethylbenzene
- 1,3,5-Trimethylbenzene
- n-Propylbenzene
- phenanthrene
- carbon disulfide
- tert-amyl methyl ether
- cyanide
- acenapthene
- arsenic
- barium
- chromium
- copper
- nickel
- selenium

Many of these chemicals are carcinogenic and/or reprotoxic in humans. Long-term exposure to many of these chemicals can also cause respiratory issues, eye irritation, gastrointestinal issues, organ failure, and death. The Facility is causing and has caused a threat to public health and the environment by discharging leachate into the Impacted Waters.

Moreover, the Facility has discharged and continues to discharge stormwater with excessive concentrations of chemical oxygen demand, nitrite plus nitrate nitrogen, and phosphorous, often many orders of magnitude in excess of relevant standards. Among other things, these discharges help to contribute to the harmful algal blooms that have and continue to plague the San Pablo and San Francisco Bays. Anderson, D., *HABs in a changing world: a perspective on harmful algal blooms, their impacts, and research and management in a dynamic era of climactic and environmental change*. Harmful Algae 2012 (2012). Given that harmful algal blooms are currently a major water quality problem facing the San Francisco Bay, the Facility's discharges of these pollutants are particularly concerning. Ezra Romero, *Last Summer's Fish-Killing Algae Bloom Is Back in the Bay*, (July 31, 2023), KQED, available at https://www.kqed.org/science/1983631/last-summers-fish-killing-algae-bloom-is-back-in-the-bay.

## II. REPUBLIC'S ONGOING VIOLATIONS OF THE RESOURCE CONSERVATION AND RECOVERY ACT

### A. RCRA's Statutory Framework

RCRA "is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483 (1996). RCRA prohibits the disposal of solid waste, except at a sanitary landfill or hazardous waste disposal facility. 42 U.S.C. §§ 6945(a), 6903(14). "Disposal" is defined as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste . . . or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." *Id*. at §6903(3). Under RCRA, the definition of "solid waste" is broad and includes "any garbage, refuse, . . . and other discarded material, including solid, liquid, semisolid or contained gaseous material resulting from . . . agricultural operations . . .." 42 U.S.C. § 6903(27).

Congress supplied only a broad definition of "hazardous waste" in RCRA, delegating to the U.S. Environmental Protection Agency ("EPA") the task of promulgating regulations identifying the characteristics of hazardous waste and listing specific wastes as hazardous. *Id.* § 6921. In accordance with this statutory command, the EPA constructed two avenues through which a waste may be designated as "hazardous." First, the EPA published several lists of specific hazardous wastes ("Listed Wastes") which describe the wastes and assign a "waste code" to each one. 40 C.F.R. § 261, Subpart D. Second, the EPA identified four characteristics of hazardous wastes: ignitability, corrosivity, reactivity and toxicity. *Id.* § 261.20-.24. Any solid waste exhibiting one or more of these characteristics is automatically deemed a "hazardous waste" even if it is not a Listed Waste. *United States v. MacDonald*, 339 F.3d 1080, 1082 (2003). As relevant here, the Facility's leachate includes many Listed Wastes, including, but not limited to, THF,[4] Dioxane,[5] CB,[6] naphthalene,[7] 1,4-Dichlorobenzene,[8] and carbon disulfide.[9] 40 C.F.R. § 261, Subpart D. Moreover, many of the chemicals in the Facility's leachate exhibit characteristics of hazardous waste, and are therefore hazardous per se, as well. *Id.* §§ 261.20-.24.

RCRA provides that:

> Any person may commence a civil action on his own behalf – against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who **has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment**.

---

[4] The hazardous waste number for THF is U213.
[5] The hazardous waste number for Dioxane is U108.
[6] The hazardous waste number for CB is U037.
[7] The hazardous waste number for naphthalene is U165.
[8] The hazardous waste number for 1,4-Dichlorobenzene is U072.
[9] The hazardous waste number for carbon disulfide is P022.

42 U.S.C. § 6972(a)(1)(B). For the reasons stated below, Republic is contributing and has contributed to an imminent and substantial endangerment to human health or the environment.

**B. Past and Ongoing Endangerment**

The Facility was deactivated in 2006, and its closure was approved in 2010. As part of the closure requirements, and to prevent leachate releases to the Impacted Waters, Republic is required to maintain an inward hydraulic gradient from San Francisco Bay to the Facility. Republic's own well monitoring data indicates that it has long failed and continues to fail to maintain the required inward hydraulic gradient and has, as a result, allowed leachates formed from contact with solid and hazardous waste housed in the landfill to migrate into the Impacted Waters.

According to the Facility's 2024 Annual Monitoring Report, which documents groundwater monitoring and sample results, leachate flowing outward from the Facility contained concentrations of Dioxane in January and again in August 2024 (and presumably continuously between and after these dates) that exceeded the EPA's established safety limit by more than 17 times. Additionally, during these periods, leachate contained other pollutants—including CB, TBA, THF, MTBE, DE, dichlorobenzene, isopropylbenzene, naphthalene, n-propylbenzene, carbon disulfide, and diisopropyl alcohol—at concentrations exceeding regulatory safety thresholds previously determined to be acceptable for the site, in many cases surpassing these limits by orders of magnitude. These results match those from the Facility's reported exceedances from September 2024, August 2023, February 2023, and August 2020. Republic has stated that these monitoring results are representative of the Facility's consistent functioning. Thus, CSPA believes, and thereon alleges, that these pollutants have continued to be discharged in harmful amounts. **Attachment A** hereto provides copies of the above-referenced monitoring data, prepared and published by Republic, for your ease of reference.

Since the material at issue here is leachate from a landfill, it is RCRA solid waste. 42 U.S.C. § 6903(27). Further, because many of the chemicals referenced above, including Dioxane, benzene, CB, THF, DIPE, 1,4-Dichlorobenzene, naphthalene, and carbon disulfide, among others, are Listed Wastes, the Facility's leachate constitutes hazardous waste under RCRA. 40 C.F.R. § 261, Subpart D; *see also Union Pac. R.R. Co. v. Hill*, 2021 U.S. Dist. LEXIS 240524, at *5 (N.D. Cal. Dec. 16, 2021) (RCRA imminent and substantial endangerment case involving a leak of Dioxane, among other chemicals); *Homefed Vill. III Master, LLC v. Otay Landfill, Inc*., 2023 U.S. Dist. LEXIS 120204, at *12 (S.D. Cal. July 11, 2023) (RCRA imminent and substantial endangerment case involving leachate that contained MTBE). And since the leachate has been and continues to leach out from the Facility, Republic's actions have created and continue to present an imminent and substantial endangerment under RCRA. *United States v. Waste Industries, Inc.,* 734 F.2d 159 (4th Cir. 1984); *Ethyl Corp. v. EPA,* 176 U.S. App. D.C. 373, 541 F.2d 1, 13 (D.C. Cir.) (*en banc*), *cert. denied,* 426 U.S. 941 (1976). The Facility's leachate poses a serious environmental and public health threat.

The Facility has also failed and continues to fail to maintain an inward hydraulic gradient in the Class I landfill, causing leachate from the Class I landfill to discharge intermittently into the Class II landfill. **Attachment B** to this Notice Letter is a collection of the Facility's Hydraulic Gradient Compliance Monitoring Maps from 2015 to the present. These maps show that Republic has unlawfully discharged leachate from the Facility every month since August 21, 2015.

CSPA is informed and thereon believes that this unlawful leaching is ongoing and continuous, and by its nature has occurred and is occurring on a daily basis. CSPA bases its allegations herein on Republic's own monitoring reports, which states that the monitoring is representative of average conditions onsite (beyond the dates when samples were taken). These discharges are not authorized by any permit. Republic has thus violated and continues to violate RCRA every single day these discharges have occurred and continue to occur. The Facility has therefore been in violation of RCRA since at least May 1, 2020.

## III. REPUBLIC'S ONGOING VIOLATIONS OF THE CLEAN WATER ACT

### A. The CWA's Statutory Framework

1. The CWA's Prohibition of Any Discharge of Pollutant Without or in Violation of a Permit.

Congress enacted the Clean Water Act in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The CWA prohibits the discharge of pollutants into United States waters except as authorized by the statute. 33 U.S.C. § 1311; *San Francisco Baykeeper, Inc. v. Tosco Corp*., 309 F.3d 1153, 1156 (9th Cir. 2002). The CWA is administered largely through the NPDES permit program. 33 U.S.C. § 1342. In 1987, the Act was amended to establish a framework for regulating stormwater discharges through the NPDES system. Water Quality Act of 1987, Pub. L. 100-4, § 405, 101 Stat. 7, 69 (1987) (codified at 33 U.S.C. § 1342(p)); *see also Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 840-41 (9th Cir. 2003) (describing the problem of stormwater runoff and summarizing the Clean Water Act's permitting scheme). The discharge of pollutants without an NPDES permit or in violation of a permit is illegal. *Ecological Rights Found. V. Pacific Lumber Co*., 230 F.3d 1141, 1145 (9th Cir. 2000).

2. The Requirements of the Industrial General Permit

Pursuant to authority under the CWA, California's State Water Resource Control Board issued the General Permit to regulate stormwater discharges associated with industrial activities throughout California. Facilities discharging stormwater associated with industrial activities that have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing a Notice of Intent to Comply ("NOI"). General Permit Sections XXI.A and I.A.12. Facilities must file their NOIs before the initiation of industrial operations. *Id.* Facilities must strictly comply with all terms and conditions of the General Permit. A violation of the General Permit is a violation of the CWA. General Permit Section XXI.A. The General Permit contains three primary and interrelated categories of requirements: (1) discharge prohibitions,

receiving water limitations, and effluent limitations; (2) SWPPP requirements; and (3) self-monitoring and reporting requirements.

Dischargers are required to reduce or prevent pollutants in their stormwater discharges through implementation of best available technology economically achievable ("BAT") for toxic and nonconventional pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants. General Permit, Effluent Limitation V.A. Conventional pollutants include Total Suspended Solids, Oil & Grease, pH, Biochemical Oxygen Demand and Fecal Coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. *Id.* §§ 401.15-16.

The General Permit also incorporates Effluent Limitation Guidelines ("ELG") for industrial stormwater discharges from facilities in specific industrial categories. General Permit, Section I.K. The Facility is a landfill and therefore subject to the stormwater ELGs identified in Attachment F of the General Permit. General Permit, Section V.B. Landfills that discharge "contaminated stormwater" must achieve the effluent limitations in the table below, which represent the application of best practicable control technology currently available and the best conventional pollutant control technology. 40 C.F.R. §§ 445.21-23. "Contaminated stormwater" is defined as "storm water which comes in direct contact with landfill wastes, the waste handling and treatment areas, or landfill wastewater as defined in paragraph (f) of this section." *Id.* § 445.2(b). "Contaminated storm water" is included in the definition of "landfill wastewater." 40 C.F.R. § 445.2(f).

EFFLUENT LIMITATIONS

| Regulated parameter | Maximum daily [1] | Maximum monthly avg. [1] |
|---|---|---|
| BOD | 140 | 37 |
| TSS | 88 | 27 |
| Ammonia (as N) | 10 | 4.9 |
| α-Terpineol | 0.033 | 0.016 |
| Benzoic acid | 0.12 | 0.071 |
| *p*-Cresol | 0.025 | 0.014 |
| Phenol | 0.026 | 0.015 |
| Zinc | 0.20 | 0.11 |
| pH | (2) | (2) |

[1] Milligrams per liter (mg/L, ppm)
[2] Within the range 6 to 9.

Dischargers must collect and analyze stormwater samples from two (2) storm events within the first half of each reporting year (July to December) and two (2) storm events during the second half of each reporting year (January to June). General Permit, Section XI.B. Section XI.B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters set forth in Table 2 of the General Permit, and other pollutants likely to be in the stormwater discharged from the facility based on the pollutant source assessment. General Permit, Section XI.B.6. Dischargers must submit all sampling and analytical results via

SMARTS within thirty (30) days of obtaining all results for each sampling event. General Permit, Section XI.B.11.

**B. Past and Ongoing CWA Violations**

Based on its review of available public documents, CSPA is informed and thereon alleges that Republic is in ongoing violation of both the substantive and procedural requirements of the CWA. These violations are ongoing and continuous. Consistent with the five-year statute of limitations applicable to citizen enforcement actions, the Republic is subject to penalties for violations of the Act since May 1, 2020. A thorough, though potentially non-exhaustive accounting of the Facility's CWA violations is provided below; as CSPA learns more information about the Facility, it may become aware of additional CWA violations onsite and will inform Republic thereof accordingly.

1. Republic Discharges Leachate into the Impacted Waters without a Permit

As detailed above, Republic's well monitoring results demonstrate that leachate is discharging from the Facility into the Impacted Waters. The CWA "forbids the 'addition' of any pollutant form a 'point source' to 'navigable waters' without the appropriate permit from the…EPA." *Cty. Of Maui v. Haw. Wildlife Fund*, 140 S. Ct. 1462, 1465 (2020) (citing 33 U.S.C § 1311). The Impacted Waters are navigable waters regulated by the CWA. Further, the Facility is a point source or the "functional equivalent" of a point source, both of which are sufficient under the CWA. S*ee Cty. Of Maui*, 1476-77. Because the leachate has been and is discharging from the Facility into the Impacted Waters, Republic has violated and is violating the CWA. 33 U.S.C. § 1311(a). CSPA thus believes and thereon alleges that the Facility has unlawfully discharged toxic leachate every day since May 1, 2020, in violation of the Clean Water Act.

2. Republic Discharges Violate the General Permit

Republic's stormwater sampling results provide conclusive evidence of Republic's failure to comply with the General Permit's discharge prohibitions and effluent limitations. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988). Republic's monitoring reports indicate that the Facility has discharged and continues to discharge pollutants into the San Pablo Bay in violation of the General Permit and Clean Water Act in several ways.

First, information available to CSPA demonstrates that stormwater that falls on the Facility becomes contaminated by the landfill and other waste material onsite (thus becoming "contaminated stormwater" as defined by 40 C.F.R. § 445.2(b)) and commingles with the Facility's stormwater which discharges directly to San Pablo Bay and the San Francisco Bay from the northern and northeastern portion of the Facility. Every day that the Facility discharges contaminated stormwater, Republic has violated and violates the General Permit's Discharge Prohibitions. *See* General Permit, § III.B.

**Attachment C** shows the days when rain events caused discharges into Wildcat Marsh, San Pablo Creek, San Pablo Bay, and the San Francisco Bay. CSPA believes and herein alleges

that the Facility discharges "landfill wastewater" each time the Facility has a stormwater discharge. Accordingly, CSPA believes and herein alleges that Republic violates and violated the General Permit and Clean Water Act on each of the days identified in Attachment C.

Second, the leachate issue discussed above vis-à-vis the Facility's RCRA violations also contravenes the General Permit. As noted, the General Permit prohibits, with a few authorized exceptions not applicable here, the discharge of liquids or materials other than stormwater to jurisdictional waters unless authorized by another NPDES permit. General Permit, Section III.B. By Republic's own repeated admission and monitoring data, the Facility has failed and continues to fail to maintain an inward gradient along the northern, northeastern and eastern boundaries of the Facility and as a result allows leachate laden with dangerous organic chemicals and metals to reach the Impacted Waters on a regular basis. This leachate and the chemicals contained therein are not covered by any other Clean Water Act permit (or by the General Permit). Therefore, this leachate discharge, flowing directly into San Pablo Bay—a navigable waterway—constitutes a violation of the General Permit..[10] CSPA thus believes and thereon alleges that the Facility has unlawfully discharged toxic leachate every day since May 1, 2020, in violation of the Clean Water Act.

3. <u>Republic Has Failed to Implement BAT/BCT and Violated Effluent Limitations.</u>

Dischargers must implement Best Management Practices ("BMPs") that satisfy the BAT/BCT requirements of the CWA and the General Permit to reduce or prevent discharges of pollutants in their stormwater discharges. General Permit, Effluent Limitation V.A. To meet the BAT/BCT standard, dischargers must implement minimum BMPs and any advanced BMPs set forth in the General Permit's SWPPP Requirements provisions where necessary to reduce or prevent pollutants in discharges. *See* General Permit, Sections X.H.1-2.

The Facility's sampling results demonstrate that the Republic is not implementing adequate BMPs to comply with the General Permit's BAT/BCT requirements. *Santa Monica Baykeeper v. Kramer Metals,* 619 F.Supp.2d 914, 920, 923 (C.D. Cal. 2009); General Permit Section XII.A. Stormwater sampling data provided by Republic shows that the Facility has in the past and continues to discharge chemical oxygen demand, nitrite plus nitrate nitrogen ("N+N"), phosphorous, iron, copper, and aluminum in excess of the limits prescribed in the General Permit (referred to as Numeric Action Limits or NALs). The tables below provide instances where the Facility's discharges exceeded the NALs for these constituents, in violation of the General Permit and Clean Water Act. This data was collected from the Facility's sampling reports uploaded to SMARTS, the State Board's on-line self-reporting system.

| **Chemical Oxygen Demand ("COD")** | | | | |
|---|---|---|---|---|
| **Date** | **Monitoring Location (Well)** | **Parameter** | **Sample Result** | **NAL** |
| Feb. 13, 2025 | WCL-11D | COD | 230 mg/L | 120 mg/L |
| Feb. 13, 2025 | WCL-11C | COD | 200 mg/L | 120 mg/L |

[10] These discharges are also unpermitted discharges that violation 33 U.S.C. § 1311(a), as indicated *supra* § III.B.1.

| | | | | |
|---|---|---|---|---|
| Feb. 13, 2025 | WCL-11F | COD | 150 mg/L | 120 mg/L |
| Feb. 13, 2025 | WCL-11E | COD | 220 mg/L | 120 mg/L |
| Feb. 13, 2025 | WCL-11J | COD | 220 mg/L | 120 mg/L |
| Dec. 13, 2024 | WCL-11E | COD | 160 mg/L | 120 mg/L |
| Dec. 13, 2024 | WCL-11J | COD | 180 mg/L | 120 mg/L |
| March 1, 2024 | WCL-11C | COD | 230 mg/L | 120 mg/L |
| March 1, 2024 | WCL-11D | COD | 170 mg/L | 120 mg/L |
| March 1, 2024 | WCL-11J | COD | 200 mg/L | 120 mg/L |
| Feb. 1, 2024 | WCL-11C | COD | 190 mg/L | 120 mg/L |
| Feb. 1, 2024 | WCL-11D | COD | 250 mg/L | 120 mg/L |
| Feb. 1, 2024 | WCL-11E | COD | 240 mg/L | 120 mg/L |
| Feb. 1, 2024 | WCL-11J | COD | 200 mg/L | 120 mg/L |
| Feb. 1, 2024 | WCL-11F | COD | 160 mg/L | 120 mg/L |
| Feb. 1, 2024 | WCL-11G | COD | 170 mg/L | 120 mg/L |
| March 10, 2023 | WCL-11F | COD | 280 mg/L | 120 mg/L |
| March 10, 2023 | WCL-11G | COD | 190 mg/L | 120 mg/L |
| March 10, 2023 | WCL-11D | COD | 300 mg/L | 120 mg/L |
| March 10, 2023 | WCL-11J | COD | 230 mg/L | 120 mg/L |
| March 10, 2023 | WCL-11E | COD | 230 mg/L | 120 mg/L |
| March 10, 2023 | WCL-11C | COD | 220 mg/L | 120 mg/L |
| Feb. 1, 2023 | WCL-11D | COD | 190 mg/L | 120 mg/L |
| Dec. 27, 2022 | WCL-11G | COD | 180 mg/L | 120 mg/L |
| Dec. 27, 2022 | WCL-8 | COD | 150 mg/L | 120 mg/L |
| Dec. 27, 2022 | WCL-11C | COD | 260 mg/L | 120 mg/L |
| Dec. 27, 2022 | WCL-11D | COD | 290 mg/L | 120 mg/L |
| Dec. 27, 2022 | WCL-11E | COD | 220 mg/L | 120 mg/L |
| Dec. 27, 2022 | WCL-11F | COD | 170 mg/L | 120 mg/L |
| Dec. 27, 2022 | WCL-11J | COD | 280 mg/L | 120 mg/L |
| Dec. 1, 2022 | WCL-11C | COD | 210 mg/L | 120 mg/L |
| Dec. 22, 2021 | WCL-11C | COD | 210 mg/L | 120 mg/L |
| Dec. 22, 2021 | WCL-11D | COD | 210 mg/L | 120 mg/L |
| Dec. 22, 2021 | WCL-11G | COD | 190 mg/L | 120 mg/L |
| Dec. 22, 2021 | WCL-11J | COD | 230 mg/L | 120 mg/L |
| Dec. 22, 2021 | WCL-11E | COD | 230 mg/L | 120 mg/L |
| Oct. 21, 2021 | WCL-8 | COD | 850 mg/L | 120 mg/L |
| Oct. 21, 2021 | WCL-11G | COD | 160 mg/L | 120 mg/L |

| **Nitrite Plus Nitrate Nitrogen (“N+N”)** | | | | |
|---|---|---|---|---|
| **Date** | **Monitoring Location (Well)** | **Parameter** | **Sample Result** | **NAL** |

| | | | | |
|---|---|---|---|---|
| Feb. 13, 2025 | WCL-11G | N+N | 6.1 mg/L | 0.68 mg/L |
| Feb. 13, 2025 | WCL-11A | N+N | 2.6 mg/L | 0.68 mg/L |
| Feb. 13, 2025 | WCL-11D | N+N | 40 mg/L | 0.68 mg/L |
| Feb. 13, 2025 | WCL-11C | N+N | 29 mg/L | 0.68 mg/L |
| Feb. 13, 2025 | WCL-11F | N+N | 11 mg/L | 0.68 mg/L |
| Feb. 13, 2025 | WCL-11E | N+N | 27 mg/L | 0.68 mg/L |
| Feb. 13, 2025 | WCL-11J | N+N | 36 mg/L | 0.68 mg/L |
| Nov. 21, 2024 | WCL-8 | N+N | 0.95 mg/L | 0.68 mg/L |
| March 1, 2024 | WCL-11C | N+N | 10 mg/L | 0.68 mg/L |
| March 1, 2024 | WCL-11D | N+N | 7.1 mg/L | 0.68 mg/L |
| March 1, 2024 | WCL-11E | N+N | 22 mg/L | 0.68 mg/L |
| March 1, 2024 | WCL-11J | N+N | 22 mg/L | 0.68 mg/L |
| Feb. 1, 2024 | WCL-8 | N+N | 1.8 mg/L | 0.68 mg/L |
| Feb. 1, 2024 | WCL-11A | N+N | 6.3 mg/L | 0.68 mg/L |
| Feb. 1, 2024 | WCL-11C | N+N | 29 mg/L | 0.68 mg/L |
| Feb. 1, 2024 | WCL-11D | N+N | 51 mg/L | 0.68 mg/L |
| Feb. 1, 2024 | WCL-11E | N+N | 24 mg/L | 0.68 mg/L |
| Feb. 1, 2024 | WCL-11J | N+N | 18 mg/L | 0.68 mg/L |
| Feb. 1, 2024 | WCL-11F | N+N | 22 mg/L | 0.68 mg/L |
| Feb. 1, 2024 | WCL-11G | N+N | 8.6 mg/L | 0.68 mg/L |
| March 10, 2023 | WCL-11F | N+N | 23 mg/L | 0.68 mg/L |
| March 10, 2023 | WCL-11G | N+N | 5.1 mg/L | 0.68 mg/L |
| March 10, 2023 | WCL-11D | N+N | 31 mg/L | 0.68 mg/L |
| March 10, 2023 | WCL-8 | N+N | 5.3 mg/L | 0.68 mg/L |
| March 10, 2023 | WCL-11J | N+N | 13 mg/L | 0.68 mg/L |
| March 10, 2023 | WCL-11E | N+N | 3.6 mg/L | 0.68 mg/L |
| March 10, 2023 | WCL-11C | N+N | 29 mg/L | 0.68 mg/L |
| Feb. 1, 2023 | WCL-11D | N+N | 30 mg/L | 0.68 mg/L |
| Feb. 1, 2023 | WCL-8 | N+N | 1.8 mg/L | 0.68 mg/L |
| Dec. 27, 2022 | WCL-11G | N+N | 58 mg/L | 0.68 mg/L |
| Dec. 27, 2022 | WCL-8 | N+N | 24 mg/L | 0.68 mg/L |
| Dec. 27, 2022 | WCL-11A | N+N | 22 mg/L | 0.68 mg/L |
| Dec. 27, 2022 | WCL-11C | N+N | 120 mg/L | 0.68 mg/L |
| Dec. 27, 2022 | WCL-11D | N+N | 150 mg/L | 0.68 mg/L |
| Dec. 27, 2022 | WCL-11E | N+N | 70 mg/L | 0.68 mg/L |
| Dec. 27, 2022 | WCL-11F | N+N | 42 mg/L | 0.68 mg/L |
| Dec. 27, 2022 | WCL-11J | N+N | 70 mg/L | 0.68 mg/L |
| Dec. 1, 2022 | WCL-11C | N+N | 5.2 mg/L | 0.68 mg/L |
| Dec. 22, 2021 | WCL-11C | N+N | 150 mg/L | 0.68 mg/L |
| Dec. 22, 2021 | WCL-11D | N+N | 130 mg/L | 0.68 mg/L |

| | | | | |
|---|---|---|---|---|
| Dec. 22, 2021 | WCL-11G | N+N | 34 mg/L | 0.68 mg/L |
| Dec. 22, 2021 | WCL-11J | N+N | 130 mg/L | 0.68 mg/L |
| Dec. 22, 2021 | WCL-11E | N+N | 120 mg/L | 0.68 mg/L |
| Dec. 22, 2021 | WCL-11A | N+N | 21 mg/L | 0.68 mg/L |
| Dec. 22, 2021 | WCL-8 | N+N | 6 mg/L | 0.68 mg/L |
| Oct. 21, 2021 | WCL-11C | N+N | 1.4 mg/L | 0.68 mg/L |
| Oct. 21, 2021 | WCL-8 | N+N | 1.4 mg/L | 0.68 mg/L |
| Oct. 21, 2021 | WCL-11G | N+N | 3.2 mg/L | 0.68 mg/L |

| **Phosphorous** | | | | |
|---|---|---|---|---|
| **Date** | **Monitoring Location (Well)** | **Parameter** | **Sample Result** | **NAL** |
| Feb. 13, 2025 | WCL-11F | Phosphorous | 3.3 mg/L | 2.0 mg/L |
| Feb. 13, 2025 | WCL-11F | Phosphorous | 2.6 mg/L | 2.0 mg/L |
| Feb. 13, 2025 | WCL-11D | Phosphorous | 2.1 mg/L | 2.0 mg/L |
| Feb. 13, 2025 | WCL-11C | Phosphorous | 2.4 mg/L | 2.0 mg/L |
| March 1, 2024 | WCL-11J | Phosphorous | 2.6 mg/L | 2.0 mg/L |
| Feb. 1, 2024 | WCL-11D | Phosphorous | 2.1 mg/L | 2.0 mg/L |
| Feb. 1, 2024 | WCL-11J | Phosphorous | 4.1 mg/L | 2.0 mg/L |
| March 10, 2023 | WCL-11F | Phosphorous | 3.6 mg/L | 2.0 mg/L |
| March 10, 2023 | WCL-11G | Phosphorous | 2.4 mg/L | 2.0 mg/L |
| March 10, 2023 | WCL-11D | Phosphorous | 3.6 mg/L | 2.0 mg/L |
| March 10, 2023 | WCL-11J | Phosphorous | 4.2 mg/L | 2.0 mg/L |
| March 10, 2023 | WCL-11E | Phosphorous | 2.9 mg/L | 2.0 mg/L |
| March 10, 2023 | WCL-11C | Phosphorous | 3 mg/L | 2.0 mg/L |
| Dec. 27, 2022 | WCL-11C | Phosphorous | 2.4 mg/L | 2.0 mg/L |
| Dec. 27, 2022 | WCL-11J | Phosphorous | 2.8 mg/L | 2.0 mg/L |
| Dec. 22, 2021 | WCL-11J | Phosphorous | 3 mg/L | 2.0 mg/L |
| Dec. 22, 2021 | WCL-11E | Phosphorous | 3 mg/L | 2.0 mg/L |
| Oct. 21, 2021 | WCL-8 | Phosphorous | 2.2 mg/L | 2.0 mg/L |

| **Iron** | | | | |
|---|---|---|---|---|
| **Date** | **Monitoring Location (Well)** | **Parameter** | **Sample Result** | **NAL** |
| Dec. 13, 2024 | WCL-8 | Iron | 1.2 mg/L | 1.0 mg/L |
| Nov. 21, 2024 | WCL-8 | Iron | 1.8 mg/L | 1.0 mg/L |
| Nov. 9, 2023 | WCL-8 | Iron | 1.2 mg/L | 1.0 mg/L |
| Feb. 24, 2023 | WCL-11C | Iron | 1.9 mg/L | 1.0 mg/L |
| Feb. 3, 2023 | WCL-8 | Iron | 1.6 mg/L | 1.0 mg/L |

| | | | | |
|---|---|---|---|---|
| Dec. 27, 2022 | WCL-8 | Iron | 2.7 mg/L | 1.0 mg/L |
| Dec. 1, 2022 | WCL-8 | Iron | 1.8 mg/L | 1.0 mg/L |
| Dec. 1, 2022 | WCL-11C | Iron | 19.0 mg/L | 1.0 mg/L |
| Dec. 22, 2021 | WCL-8 | Iron | 2.2 mg/L | 1.0 mg/L |

| Copper | | | | |
|---|---|---|---|---|
| **Date** | **Monitoring Location (Well)** | **Parameter** | **Sample Result** | **NAL** |
| Feb. 13, 2025 | WCL-11G | Copper | 0.042 mg/L | 0.0332 mg/L |
| Feb. 13, 2025 | WCL-11D | Copper | 0.057 mg/L | 0.0332 mg/L |
| Feb. 13, 2025 | WCL-11C | Copper | 0.044 mg/L | 0.0332 mg/L |
| Feb. 13, 2025 | WCL-11F | Copper | 0.044 mg/L | 0.0332 mg/L |
| Feb. 13, 2025 | WCL-11E | Copper | 0.036 mg/L | 0.0332 mg/L |
| Feb. 13, 2025 | WCL-11J | Copper | 0.034 mg/L | 0.0332 mg/L |
| Dec. 13, 2024 | WCL-11J | Copper | 0.036 mg/L | 0.0332 mg/L |
| March 1, 2024 | WCL-11C | Copper | 0.048 mg/L | 0.0332 mg/L |
| March 1, 2024 | WCL-11E | Copper | 0.041 mg/L | 0.0332 mg/L |
| Feb. 24, 2023 | WCL-11C | Copper | 0.034 mg/L | 0.0332 mg/L |
| Dec. 27, 2022 | WCL-11C | Copper | 0.052 mg/L | 0.0332 mg/L |
| Dec. 27, 2022 | WCL-11D | Copper | 0.043 mg/L | 0.0332 mg/L |
| Dec. 1, 2022 | WCL-11C | Copper | 0.058 mg/L | 0.0332 mg/L |
| Jan. 4, 2022 | WCL-11E | Copper | 0.045 mg/L | 0.0332 mg/L |
| Jan. 4, 2022 | WCL-11D | Copper | 0.036 mg/L | 0.0332 mg/L |
| Jan. 4, 2022 | WCL-11C | Copper | 0.046 mg/L | 0.0332 mg/L |
| Jan. 4, 2022 | WCL-11J | Copper | 0.041 mg/L | 0.0332 mg/L |
| Dec. 22, 2021 | WCL-11E | Copper | 0.037 mg/L | 0.0332 mg/L |

| Aluminum | | | | |
|---|---|---|---|---|
| **Date** | **Monitoring Location (Well)** | **Parameter** | **Sample Result** | **NAL** |
| Dec. 13, 2024 | WCL-8 | Aluminum | 1.0 mg/L | 0.75 mg/L |
| Nov. 21, 2024 | WCL-8 | Aluminum | 1.5 mg/L | 0.75 mg/L |
| Nov. 9, 2023 | WCL-8 | Aluminum | 0.84 mg/L | 0.75 mg/L |
| Feb. 24, 2023 | WCL-11C | Aluminum | 1.9 mg/L | 0.75 mg/L |
| Feb. 3, 2023 | WCL-8 | Aluminum | 1.1 mg/L | 0.75 mg/L |
| Dec. 27, 2022 | WCL-8 | Aluminum | 1.9 mg/L | 0.75 mg/L |
| Dec. 1, 2022 | WCL-8 | Aluminum | 1.4 mg/L | 0.75 mg/L |
| Dec. 1, 2022 | WCL-11C | Aluminum | 15.0 mg/L | 0.75 mg/L |
| Dec. 22, 2021 | WCL-8 | Aluminum | 1.3 mg/L | 0.75 mg/L |
| Dec. 22, 2021 | WCL-11J | Aluminum | 0.092 mg/L | 0.75 mg/L |

Accordingly, CSPA believes and herein alleges that Republic has failed to implement the minimum BMPs required by the General Permit, including good housekeeping requirements, preventive maintenance requirements, spill and leak prevention and response requirements, material handling and waste management requirements, erosion and sediment controls, employee training and quality assurance, and record keeping. General Permit, Section X.H.1(a-g). Republic has further failed to implement advanced BMPs necessary to reduce or prevent discharges of pollutants in its stormwater sufficient to meet the BAT/BCT standards, including exposure minimization BMPs, containment and discharge reduction BMPs, treatment control BMPs, or other advanced BMPs necessary to comply with the General Permit's effluent limitation guidelines. General Permit, Sections X.H.2. Each day that Republic has failed to develop and implement BAT/BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). Republic has been in violation of the BAT/BCT requirements at the Facility every day since at least May 1, 2020.

4. Republic has Failed to Implement an Adequate Monitoring Implementation Plan.

The General Permit requires dischargers to implement a Monitoring Implementation Plan. General Permit, Section X.I. As part of their monitoring plan, dischargers must identify all stormwater discharge locations. General Permit, Section X.I.2.a. Dischargers must then conduct monthly visual observations of each drainage area, as well as visual observations during discharge sampling events. General Permit, Section XI.A.1 and 2. Dischargers must also collect and analyze stormwater samples from two (2) storm events within the first half of each reporting year (July 1 to December 31) and two (2) storm events during the second half of each reporting year (January 1 to June 3). General Permit, Section XI.B. Section XI.B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters set forth in Table 2 of the General Permit, including pollutants identified in ELGs, and other pollutants likely to be in the stormwater discharged from the facility based on the pollutant source assessment. General Permit, Section XI.B.6. Dischargers must submit all sampling and analytical results via SMARTS within thirty (30) days of obtaining all results for each sampling event. General Permit, Section XI.B.11. Facilities subject to federal stormwater effluent limitation guidelines must collect and analyze samples from Qualifying Storm Events ("QSE") for each regulated pollutant specified in Section XI.B of the General Permit. General Permit, Section XI.D.1. And facilities subject to stormwater ELGs are ineligible for the Representative Sampling Reduction in Section XI.C.4 of the General Permit. General Permit, Section XI.D.3.

Information available to CSPA indicates that Republic has failed to analyze for several landfill-specific pollutants in its stormwater. As noted, as a landfill operator, Republic must test for and control discharges of certain constituents that are expected to be in landfill-related wastewater. 40 C.F.R. §§ 445.21-23. Yet, the stormwater sampling results from the Facility demonstrate that Republic has failed to test for ammonia, benzoic acid, p-cresol, and α-terpineol throughout the last five (5) years, as required by the landfill-specific ELGs identified above. This constitutes a violation of the General Permit and a failure by Republic to adequately execute a Monitoring Implementation Plan. Likewise, Republic has failed to sample its stormwater for the chemical constituents present in the Facility's leachate, even though it knows or reasonably should expect that such chemicals are in its stormwater. This too constitutes a violation of the

General Permit. General Permit, Section XI.B.6.

Information available to CSPA further shows that Republic has failed to adequately sample every stormwater discharge point when conducting sampling, in violation of the General Permit and Clean Water Act on several occasions throughout the last five years. General Permit, Section XI.A.1 and 2. Each day that Republic has failed to develop and implement an adequate Monitoring Implementation Plan is a separate and distinct violation of the Act and General Permit. Republic has thus been in violation of the Monitoring Implementation Plan requirements every day since at least May 1, 2020.

5. Republic has Failed to Develop and Implement an Adequate Stormwater Pollution Prevention Plan.

The General Permit requires dischargers to develop and implement a site-specific SWPPP. General Permit, Section X.A. The SWPPP must include, among other elements: (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable. *See id.* Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS for any non-significant revisions not more than once every three (3) months in the reporting year. General Permit, Section X.B.

One reason why a discharger may be required to modify its SWPPP is pursuant to the General Permit's Exceedance Response Action ("ERA") program. General Permit, Section XII.C.2. Section XII of the General Permit requires dischargers to take certain actions if the results of their stormwater monitoring samples exceed the NALs set forth in the Permit. Dischargers enter ERA Level 1 if sampling results indicate an NAL exceedance. General Permit, Section XII.C. Dischargers enter Level 1 on July 1 following the reporting year during which the exceedance(s) occurred. *Id*. By October 1 following commencement of Level 1 status, dischargers are required to complete an ERA Level 1 Evaluation. General Permit, Section XII.C.1. By January 1 following the commencement of Level 1, dischargers are required to revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation and certify and submit via SMARTS a Level 1 ERA Report. General Permit, Section XII.C.2. If sampling results indicate an NAL exceedance for an ERA Level 1 parameter, the discharger's status will change to Level 2, on July 1, for that parameter. General Permit, Section XII.D. By January 1 following the commencement of Level 2 status, the discharger must complete a Level 2 ERA Action Plan. General Permit, Section XII.D.1. One year later, on January 1 following the submittal of the Level 2 ERA Action Plan, the discharger is required to complete a Level 2 ERA Technical Report. General Permit, Section XII.D.2.

Here, the Facility is subject to ERA Level 2 controls for copper, COD, aluminum, iron, N+N, and phosphorous. Yet, self-reported sampling data from February 2025 shows that the Facility continues to discharge stormwater with concentrations of copper, iron, aluminum, N+N,

and COD in excess of the relevant NALs (sometimes by several orders of magnitude). This demonstrates that the modifications Republic has committed to as part of its most recent SWPPP are not adequate to reduce its discharges below NAL levels and bring the Facility into compliance (and out of ERA Level 2). This violates the General Permit and demonstrates that the Facility's SWPPP remains legally inadequate.

Moreover, and importantly, the Facility has not been upgraded to Level 1 (or Level 2 for that matter) for phosphorous even though it has repeatedly and consistently discharged stormwater with excessive concentrations of phosphorous far above the NAL for that constituent. The Facility's own stormwater sampling (provided *supra*) demonstrates this. Republic's failure to upgrade the Facility to ERA Level 1 in 2022 after the Facility's self-reported discharge monitoring reports showing high levels of phosphorous (and Level 2 the following year) constitute additional violations of the General Permit.[11]

## C. Date of Violations Application to this Notice Letter

As noted above, both RCRA and the CWA were violated every day for the last five years and will continue to be violated every day until meaningful corrective action is taken.

## D. Nuisance

In addition to Republic's past and ongoing violations of both RCRA and the CWA, the Facility's leachate and stormwater discharge problems also constitute a public nuisance. Public nuisance is established by showing that:

1. [The defendant], by acting or failing to act, created a condition that[]:
   i. Was harmful to health;
   ii. Was indecent or offensive to the senses; or
   iii. Was an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property[.]
2. The condition affected a substantial number of people at the same time;
3. An ordinary person would be reasonably annoyed or disturbed by the condition;
4. The seriousness of the harm outweighs the social utility of [defendant's] conduct;

---

[11] As noted above, both RCRA and the CWA were violated every day for the last five years in multiple ways. However, the statute of limitations for the Clean Water Act claims associated with the Facility's violations of the General Permit is truncated by CSPA's prior consent decree with Republic, which releases its claims vis-à-vis violations up to November 1, 2023. Accordingly, CSPA intends only to raise claims regarding the Facility's ongoing and past violations of the General Permit from November 1, 2023. However, because the consent decree does not cover RCRA or the Facility's unpermitted leachate discharges, CSPA intends to raise claims regarding these violations for the full duration of the CWA's statute of limitations. Moreover, the prior consent decree does not release all of the entities noticed herein, and CSPA intends to raise claims against those entities for the full duration of the CWA's statute of limitations.

5. [Plaintiff] did not consent to [defendant's] conduct;
6. [Plaintiff] suffered harm that was different from the type of harm suffered by the general public; and,
7. [Defendant's] conduct was a substantial factor in causing [plaintiff's] harm.

*See* Judicial Council of California Jury Instructions (2019) No. 2020.

Likewise, a nuisance *per se* occurs when the Legislature declares that a particular act is a nuisance. *Olson v. Beck*, 2011 U.S. Dist. Lexis 114805 at *61 (N.D. Cal. 2011) ("A nuisance *per se exists* where the nuisance is 'legislatively declared.'"). Nuisance *per se* does not require the plaintiff show harm. Rather a nuisance *per se* occurs as long as "the conditions specified in the statute or ordinance [defining the nuisance] exist." (*Id*. at *62.) Here, local laws declare Republic's past and ongoing leaching and discharging a public nuisance. *See, e.g*., Richmond Mun. Code § 9.22.090 (defining public nuisance as the "keeping, storage, depositing or accumulation on the premises of any … solid waste, rubbish, and debris, which is within the view of persons on adjacent or nearby real property or the public right-of-way and which poses a risk of harm to the public or constitutes visual blight or reduces the aesthetic appearance of the neighborhood or is offensive to the senses or is detrimental to the use and enjoyment of nearby properties or reduces nearby property values").

The violations of RCRA and the discharge violations of the CWA discussed *supra* constitute a nuisance *per se* and a public nuisance under California common law. *Beck*, 2011 U.S. Dist. Lexis 114805 at *61; *City of Modesto Redevelopment Agency*, 119 Cal.App.4th at 39. The Facility's discharges endanger public health and cause and exacerbate harmful algal blooms in the San Pablo Bay and the San Francisco Bay and therefore constitute a public nuisance and nuisance *per se*.

## IV. IDENTIFICATION OF NOTICING PARTY AND COUNSEL

The organization providing this Notice is California Sportfishing Protection Alliance. CSPA's contact information is:

California Sportfishing Protection Alliance
Attn: Chris Shutes, Executive Director
1608 Francisco Street
Berkeley, California 94703
Email: cshutes@calsport.org
Telephone: (510) 421-2405.

CSPA has retained legal counsel to represent it in this matter. All communications concerning this Notice Letter should be addressed to:

Erica A. Maharg
Harrison Beck
Aqua Terra Aeris Law Group
8 Rio Vista Avenue
Oakland, California 94611

Phone: (916) 202-3018
Email: eam@atalawgroup.com
Email: hmb@atalawgroup.com

Andrew L. Packard
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Phone: (707) 782-4060
Email: andrew@packardlawoffices.com

During the 60- and 90-day notice periods for violations of the CWA and RCRA, respectively, CPSA would like to discuss effective remedies with Republic to immediately address the violations noted in this Notice Letter. If Republic wishes to pursue such discussions, we suggest that you initiate those discussions as soon as possible. At the close of the notice periods, if a complete and comprehensive solution is not finalized, CSPA intends to move forward with litigation to prevent further ongoing violations of RCRA and the CWA.

Sincerely,

Erica A Maharg

Erica Maharg
Aqua Terra Aeris Law Group
*On behalf of* California Sportfishing Protection Alliance

Andrew L. Packard
Law Offices of Andrew L. Packard
*On behalf of* California Sportfishing Protection Alliance

**Attachments**

**EXHIBIT C**

| Parameter | Test Method | Reporting Units | Evaluation Level |
|---|---|---|---|
| pH | See Section XI.C.2 of the General Permit | pH units | Less than 6.0<br>Greater than 9.0 |
| Total Suspended Solids | SM 2540-D | mg/L | 100 (annual average NAL), 400 (instantaneous maximum NAL) |
| Oil & Grease | EPA 1664A | mg/L | 15 (Annual NAL) and 25 (instantaneous maximum NAL) |
| Chemical Oxygen Demand (COD) | SM 5220C | mg/L | 120 |
| Aluminum | EPA 200.8 | mg/L | 0.75 |
| Iron | EPA 200.7 | mg/L | 1.0 |
| Lead | EPA 200.8 | mg/L | 0.262 |
| Zinc | EPA 200.8 | mg/L | 0..26 |
| Copper (Cu) | EPA 200.8 | mg/L | 0.0332 |
| Nitrate plus Nitrite Nitrogen | SM4500-NO3-E | mg/L as N | 0.68 |
| Phosphorus | SM 4500-P B+E | mg/L as P | 2.0 |

SM – Standard Methods for the Examination of Water and Wastewater, 18th edition
EPA – U.S. EPA test methods

DRAFT

# EXHIBIT D

NATIONAL WEATHER SERVICE

NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION

HOME FORECAST ▾ PAST WEATHER ▾ SAFETY ▾ INFORMATION ▾ EDUCATION ▾ NEWS ▾ SEARCH ▾ ABOUT ▾

**Point Forecast:** Richmond CA
37.94N 122.34W (Elev. 131 ft)

Last Update: 12:37 pm PDT May 7, 2026

**Hourly Weather Forecast Graph**

[dashes/dots] | [b/w] | [hide menu] XML

| Weather Elements | Weather/Precipitation | |
|---|---|---|
| ☑ Temperature (°F) | ☑ Rain | ☐ Trans. Wind mph |
| ☑ Dewpoint (°F) | ☑ Thunder | ☐ 20ft Wind mph |
| ☑ Heat Index (°F) | ☐ Fog | |
| ☑ Surface Wind mph | | |
| ☑ Sky Cover (%) | | |
| ☑ Precipitation Potential (%) | | |
| ☑ Relative Humidity (%) | | |

48-Hour Period Starting: 12pm Thu, May 7 2026 [Submit]   Back 2 Days | Forward 2 Days




**Saturday, May 9 at 4am**
Temperature: 53 °F Dewpoint: 50 °F Heat Index: N/A Surface Wind: S 5mph
Sky Cover (%): 31% Precipitation Potential (%): 0% Relative Humidity (%): 89%
Rain: <10% Thunder: <10%

**Additional Forecasts & Information**

| | |
|---|---|
| International System of Units | Forecast Discussion |
| 7-Day Forecast | Tabular Forecast |
| River Stage Summary | 24 Hour Precipitation Summary |
| NWS Office Map | |




## LEGEND

- APPROXIMATE LIMITS OF WASTE
- APPROXIMATE PROPERTY BOUNDARY
- 40 — EXISTING TOPOGRAPHY (10 FT CONTOUR INTERVAL)
- EXISTING TOPOGRAPHY (2 FT CONTOUR INTERVAL)
- EXISTING ROAD
- CONTACT STORMWATER CONVEYANCE PIPE
- STORMWATER MONITORING LOCATION
- STORMWATER BERM FLOW PATH

**NOTE:**

EXISTING TOPOGRAPHY OBTAINED FROM AERIAL TOPOGRAPHY BY FIRMATEK 3D MAPPING SOLUTIONS, DATED APRIL 22, 2025.

■ DRAFT
☐ RELEASED FOR BID
☐ APPROVED FOR CONSTRUCTION
☐ CLIENT APPROVAL BY:
☐ OTHER:

PREPARED FOR: REPUBLIC SERVICES

# EXHIBIT D

WEST CONTRA COSTA SANITARY LANDFILL
RICHMOND, CALIFORNIA

| No. | DATE | REVISION DESCRIPTION | BY |
|---|---|---|---|

Weaver Consultants Group

WEAVER CONSULTANTS GROUP
9695 LEBANON RD, STE 400
MOUNT JULIET, TENNESSEE 37122
(630) 717-4848
www.wcgrp.com

REUSE OF DOCUMENTS
This document, and the designs incorporated herein, as an instrument of professional service, is the property of Weaver Consultants Group, and is not to be used in whole or in part, without the written authorization of Weaver Consultants Group.

| | |
|---|---|
| DRAWN BY: | AWW |
| REVIEWED BY: | JED |
| DATE: | 09/26/2025 |
| FILE: | 0120-913-56-01 |
| CAD: | Site Map - svc.dwg |

Exhibit D

W:\Naperville\Naperville - F Drive\PROJECTS\0120\913 - West Contra Costa LF\Drawings\Site Map - svc.dwg;WCGv19b5;scrane;May 22, 2026

COPYRIGHT © 2025 WEAVER CONSULTANTS GROUP. ALL RIGHTS RESERVED.

# EXHIBIT E

Confidential Settlement Communication FRE 408; Evidence Code 1152




**Explanation**

- Pumping well or sump
- Non-pumping well or sump
- Proposed Transducer Location
- Pump installation location (QR-23S)
- Proposed new extraction well
- Proposed replacement extraction well
- Proposed new piezometer

Notes:
1. Proposed well locations are labeled in **bold**.
2. Proposed well locations are approximate.
3. QR-15S and QR-16 will be converted to non-pumping locations when replaced by QR-50 and QR-51, respectively.
4. Existing well and sump locations shown include Consent Decree Compliance Monitoring Points (CMPs) and active extraction locations in the Class II and E-22R areas.

Image source: ESRI (February 2026)

Geo-Logic ASSOCIATES

8/21/2026 DB25.1236

WEST CONTRA COSTA SANITARY LANDFILL

**New Extraction Well, Piezometer, QR-23S, and Pump Installation Locations**

Exhibit E-1

Q:\PROJECTS\DB25.1235_WEST_COUNTY_LANDFILL\GIS\ARCGIS_PRO\SITE MAPS\SITE MAPS1.APRX • EXHIBIT E-1




Image source: ESRI (February 2026)

**Explanation**

- Pumping well or sump
- Non-pumping well or sump
- Pump installation location (QR-23S)

Notes:
1. Proposed well locations are labeled in **bold**.
2. Existing well and sump locations shown include Consent Decree Compliance Monitoring Points (CMPs) and active extraction locations in the Class II and E-22R areas.
3. Proposed new/replacement locations not shown.

Geo-Logic ASSOCIATES
8/21/2026 DB25.1236

WEST CONTRA COSTA SANITARY LANDFILL

**QR-23S Pump Installation Location**

Exhibit E-2

Q:\PROJECTS\DB25.1235_WEST_COUNTY_LANDFILL\GIS\ARCGIS_PRO\SITE MAPS\SITE MAPS1.APRX • EXHIBIT E-2

Confidential Settlement Communication FRE 408; Evidence Code 1152




**Explanation**

- Pumping well or sump
- Non-pumping well or sump
- Proposed new extraction well
- Proposed replacement extraction well
- Proposed new piezometer

Notes:
1. Proposed well locations are labeled in **bold**.
2. Proposed well locations are approximate.
3. QR-15S and QR-16 will be converted to non-pumping locations when replaced by QR-50 and QR-51, respectively.
4. Existing well and sump locations shown include locations in the Class II and E-22R areas that will be active during the term of the Consent Decree, as well as QR-15S and QR-16.

Image source: ESRI (February 2026)

WEST CONTRA COSTA SANITARY LANDFILL

**New and Replacement Well and Piezometer Locations**

Geo-Logic ASSOCIATES

8/21/2026 DB25.1236

Q:\PROJECTS\DB25.1235_WEST_COUNTY_LANDFILL\GIS\ARCGIS_PRO\SITE MAPS\SITE MAPS1.APRX • EXHIBIT E-3

**Confidential Settlement Communication FRE 408; Evidence Code 1152**




**Explanation**

- Pumping well or sump
- Non-pumping well or sump
- Proposed Transducer Location

Notes:
1. Transducer locations are labeled in **bold**.
2. Existing well and sump locations shown include Consent Decree Compliance Monitoring Points (CMPs) and active extraction locations in the Class II and E-22R areas.
3. Proposed new/replacement locations not shown.

Image source: ESRI (February 2026)

Geo-Logic ASSOCIATES

8/21/2026 DB25.1236

Q:\PROJECTS\DB25.1235_WEST_COUNTY_LANDFILL\GIS\ARCGIS_PRO\SITE MAPS\SITE MAPS1.APRX • EXHIBIT E-4

WEST CONTRA COSTA SANITARY LANDFILL

**Transducer Monitoring Locations**

Exhibit E-4

Confidential Settlement Communication FRE 408; Evidence Code 1152




Explanation

I&M program location

Notes:
1. Wells included in the I&M program include all active Class II and E-22R wells, excluding wells with Lorentz Pumps.
2. I&M occurred in wells with Lorentz pumps in Q1 2026 during pump installation.

Image source: ESRI (February 2026)

Q:\PROJECTS\DB25.1235_WEST_COUNTY_LANDFILL\GIS\ARCGIS_PRO\SITE MAPS\SITE MAPS1.APRX • EXHIBIT E-5

Geo-Logic ASSOCIATES
8/21/2026 DB25.1236

WEST CONTRA COSTA SANITARY LANDFILL

**Pump Inspection and Maintenance (I&M) Program Locations**

Exhibit E-5

# EXHIBIT F




Explanation

- Single-phase gas well proposed for dual-phase conversion
- Existing dual-phase gas well proposed for pumping optimization
- Existing dual-phase gas well
- Existing single-phase gas well

Image source: ESRI (February 2026)

Notes:
1. Gas well data from SCSeTools® current as of June 2026.
2. Gas well IDs for existing and proposed dual-phase wells are shown in **bold**.

Q:\PROJECTS\DB25.1235_WEST_COUNTY_LANDFILL\GIS\ARCGIS_PRO\SITE MAPS\SITE MAPS1.APRX • EXHIBIT F

Geo-Logic ASSOCIATES 8/21/2026 DB25.1236

WEST CONTRA COSTA SANITARY LANDFILL
**Gas Well Network Improvements**

Exhibit F

# EXHIBIT G

Confidential Settlement Communication FRE 408; Evidence Code 1152




Image source: ESRI (February 2026)

Note: Gas wells shown to be monitored for liquid levels under the Consent Decree.

**Explanation**

Gas well monitoring location

Geo-Logic ASSOCIATES

8/21/2026 DB25.1236

Q:\PROJECTS\DB25.1235_WEST_COUNTY_LANDFILL\GIS\ARCGIS_PRO\SITE MAPS\SITE MAPS1.APRX • EXHIBIT G

WEST CONTRA COSTA SANITARY LANDFILL

**Gas Well Liquid Level Monitoring Network**

Exhibit G

# EXHIBIT H




**Explanation**

- Pumping well or sump
- Non-pumping well or sump
- Proposed replacement extraction well

Notes:
1. Proposed replacement well locations are labeled in **bold**.
2. Proposed well locations are approximate.
3. QR-15S and QR-16 will be converted to non-pumping locations when replaced by QR-50 and QR-51, respectively.
4. Existing well and sump locations shown include locations in the Class II and E-22R areas that will be active during the term of the Consent Decree, as well as QR-15S and QR-16.

Image source: ESRI (February 2026)

WEST CONTRA COSTA SANITARY LANDFILL

**QR-15S and QR-16 Replacement Well Locations**

Geo-Logic ASSOCIATES

8/21/2026 DB25.1236

Exhibit H

Q:\PROJECTS\DB25.1235_WEST_COUNTY_LANDFILL\GIS\ARCGIS_PRO\SITE MAPS\SITE MAPS1.APRX • EXHIBIT H

# EXHIBIT I




## LEGEND

| | |
|---|---|
| (symbol) | CLASS BOUNDARY |
| (symbol) | EXISTING 10' CONTOUR |
| (symbol) | EXISTING 2' CONTOUR |
| (symbol) | EXISTING HEADER/LATERAL LINE |
| (symbol) | PROPOSED LEACHATE FORCE MAIN |
| (symbol) | PROPOSED COMPRESSED AIR LINE |
| (symbol) | VERTICAL LFG WELLS FOR THE DEWATERING SYSTEM EXPANSION |
| (symbol) | EXISTING LFG EXTRACTION WELL |
| (symbol) | EXISTING DUAL COMPLETION LFG EXTRACTION WELL |
| (symbol) | EXISTING ISOLATION VALVE |
| (symbol) | EXISTING CONDENSATE COLLECTION POINTS |
| (symbol) | EXISTING CLASS II LEACHATE SUMP |

NOTES:

1. TOPOGRAPHIC INFORMATION FOR SITE FLYOVER DATED APRIL 22, 2025 BY FIRMATEK.
2. FIGURE ADDED FROM SHEET NO. 1 "LFG EXTRACTION SYSTEM DRAWING" PREPARED BY CORNERSTONE ENVIRONMNTAL DATED JULY 01, 2016.

N

SCALE: 1" = 200'

0 100' 200' 400'

☐ DRAFT
☐ RELEASED FOR BID
☐ APPROVED FOR CONSTRUCTION
☐ CLIENT APPROVAL BY: ____
☐ OTHER: ____

PREPARED FOR:
WEST CONTRA COSTA COUNTY LANDFILL

# LANDFILL GAS DEWATERING SYSTEM EXPANSION PRELIMINARY DRAWING EX. I

WEST CONTRA COSTA COUNTY LANDFILL
CONTRA COSTA COUNTY, CALIFORNIA

| No. | DATE | REVISION DESCRIPTION | BY |
|---|---|---|---|
| | | | |

Weaver Consultants Group

WEAVER CONSULTANTS GROUP
1316 BOND STREET, SUITE 108
NAPERVILLE, ILLINOIS 60563
(630) 717-4848

www.wcgrp.com

REUSE OF DOCUMENTS
This document, and the designs incorporated herein, as an instrument of professional service, is the property of Weaver Consultants Group, and is not to be used in whole or in part, without the written authorization of Weaver Consultants Group.

| | |
|---|---|
| DRAWN BY: | STB |
| REVIEWED BY: | JPV |
| DATE: | 08/18/2026 |
| FILE: | 0120-913-DWG |
| CAD: | WCCSL0007.dwg |

EXHIBIT I

F:\PROJECTS\0120\913 - West Contra Costa LF\Dwg\WCCSL0007.dwg;WCGv19b5;stbutler;August 18, 2026

COPYRIGHT © 2026 WEAVER CONSULTANTS GROUP. ALL RIGHTS RESERVED.

# EXHIBIT J




## LEGEND

| | |
|---|---|
| (symbol) | CLASS BOUNDARY |
| (symbol) | EXISTING 10' CONTOUR |
| (symbol) | EXISTING 2' CONTOUR |
| 16"HEADER | EXISTING HEADER/LATERAL LINE |
| 6"X4" HDPE | EXISTING PERIMETER LEACHATE FORCE MAIN (SEE B & C FOR DISCUSSION) |
| (symbol) | EXISTING LFG EXTRACTION WELL |
| (symbol) | EXISTING DUAL COMPLETION LFG EXTRACTION WELL |
| (symbol) | EXISTING ISOLATION VALVE |
| (symbol) | EXISTING CONDENSATE COLLECTION POINTS |
| (symbol) | EXISTING CLASS II LEACHATE SUMP (SEE A FOR DISCUSSION) |

PROPOSED UPGRADES TO LEACHATE FORCE MAIN:

A. LIFT STATIONS:
EVALUATE EXISTING LIFT STATION PUMP CAPACITY AND OPERATING CONDITIONS BASED ON EXISTING AND PROJECTED LANDFILL LIQUID FLOWS. POTENTIAL UPGRADES MAY INCLUDE MODIFICATIONS TO PUMP CAPACITY AND/OR OPERATING CONTROLS TO ACCOMMODATE INCREASED FLOWS AND IMPROVE SYSTEM RELIABILITY.

B. FORCE MAIN PIPING:
EVALUATE EXISTING FORCE MAIN HYDRAULIC CAPACITY AND POTENTIAL PIPING UPGRADES TO ACCOMMODATE PROJECTED FLOWS. PIPE SIZING WILL CONSIDER SYSTEM HEADLOSS AND MAINTAINING APPROPRIATE FLOW VELOCITIES TO MINIMIZE SCALING, SEDIMENT ACCUMULATION, AND POTENTIAL PLUGGING.

C. FORCE MAIN CONVEYANCE CONFIGURATION:
EVALUATE MODIFICATIONS TO THE EXISTING FORCE MAIN LAYOUT, INCLUDING POTENTIAL LOOPED AND/OR PARALLEL PIPING CONFIGURATIONS, TO IMPROVE HYDRAULIC PERFORMANCE AND PROVIDE REDUNDANT CONVEYANCE PATHWAYS DURING MAINTENANCE, BLOCKAGE, OR OTHER OPERATIONAL EVENTS.

D. SCADA AND SYSTEM CONTROLS:
EVALUATE EXISTING SCADA AND CONTROL SYSTEMS AND POTENTIAL UPGRADES TO IMPROVE SYSTEM MONITORING, OPERATIONAL CONTROL, AND RELIABILITY. POTENTIAL IMPROVEMENTS MAY INCLUDE MONITORING, ALARMS, AND DATA LOGGING FOR PUMP DISCHARGE PRESSURE, LIQUID LEVELS, FLOW RATES, PUMP STATUS, AND OTHER KEY OPERATING PARAMETERS.

NOTE:
THE IMPROVEMENTS SHOWN ARE CONCEPTUAL AND REPRESENT POTENTIAL MODIFICATIONS TO THE EXISTING LEACHATE FORCE MAIN SYSTEM. FINAL IMPROVEMENTS AND CONFIGURATIONS WILL BE ESTABLISHED BASED ON HYDRAULIC EVALUATION, DETAILED DESIGN, AND APPLICABLE PERMITTING REQUIREMENTS.

NOTES:

1. TOPOGRAPHIC INFORMATION FOR SITE FLYOVER DATED APRIL 22, 2025 BY FIRMATEK.
2. FIGURE ADDED FROM SHEET NO. 1 "LFG EXTRACTION SYSTEM DRAWING" PREPARED BY CORNERSTONE ENVIRONMNTAL DATED JULY 01, 2016.

N

SCALE: 1" = 200'
0 100' 200' 400'

F:\PROJECTS\0120\913 - West Contra Costa LF\Dwg\WCCSL0008.dwg;WCGv19b5;sbutler;August 18, 2026

COPYRIGHT © 2026 WEAVER CONSULTANTS GROUP. ALL RIGHTS RESERVED.

☐ DRAFT
☐ RELEASED FOR BID
☐ APPROVED FOR CONSTRUCTION
☐ CLIENT APPROVAL BY: ______
☐ OTHER: ______

PREPARED FOR:
WEST CONTRA COSTA COUNTY LANDFILL

# LEACHATE FORCE MAIN SYSTEM UPGRADE PLAN EX. J

WEST CONTRA COSTA COUNTY LANDFILL
CONTRA COSTA COUNTY, CALIFORNIA

| No. | DATE | REVISION DESCRIPTION | BY |
|---|---|---|---|

Weaver Consultants Group

WEAVER CONSULTANTS GROUP
1316 BOND STREET, SUITE 108
NAPERVILLE, ILLINOIS 60563
(630) 717-4848
www.wcgrp.com

REUSE OF DOCUMENTS
This document, and the designs incorporated herein, as an instrument of professional service, is the property of Weaver Consultants Group, and is not to be used in whole or in part, without the written authorization of Weaver Consultants Group.

| | |
|---|---|
| DRAWN BY: | STB |
| REVIEWED BY: | JPV |
| DATE: | 08/18/2026 |
| FILE: | 0120-913-DWG |
| CAD: | WCCSL0008.dwg |

EXHIBIT J

# EXHIBIT K




**Explanation**

#1 Well pair identifier

CMP (new well location)

CMP (existing location)

Notes:
1. Each well pair includes an inboard and outboard Compliance Monitoring Point (CMP)
2. "New well locations" include new wells or piezometers installed under terms of the consent decree that will be used as a CMP. All new well locations are shown on Exhibit G.

Image source: ESRI (February 2026)

WEST CONTRA COSTA SANITARY LANDFILL

**Consent Decree Compliance Monitoring Points (CMPs)**

Geo-Logic ASSOCIATES

8/21/2026 DB25.1236

Exhibit K

Q:\PROJECTS\DB25.1235_WEST_COUNTY_LANDFILL\GIS\ARCGIS_PRO\SITE MAPS\SITE MAPS1.APRX • EXHIBIT K